THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ALLEN E. ZENNER, Defendant-Appellant.

First District (4th Division)    No. 77-1492

Opinion filed May 8, 1980.

James J. Cutrone and David Ross Appleton, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, James S. Veldman, and Paula M. Daleo, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, defendant Allen Zenner was convicted of aggravated battery and sentenced to a term of 3 years' probation. On appeal defendant contends: (1) he was not proved guilty beyond a reasonable doubt; and (2) he was denied due process when the trial court recalled a witness after the close of final arguments.

At trial the complaining witness, Thomas Norton, testified that on the evening of October 3, 1975, he had gone to the home of defendant's estranged wife Sharon Zenner between 12:30 and 1 a.m. after having talked to her on the telephone at about 9 p.m. Upon arriving he talked with her and ate some food he brought with him. He also stated he had consumed about four beers before arriving but was not intoxicated. He then fell asleep on the couch in the living room while fully clothed and awoke when he heard Sharon Zenner talking in a loud voice on the telephone. After she concluded her conversation, Norton told her he was leaving. At that time the doorbell rang and she told him it was defendant; Norton then returned to the front room.

When defendant walked into the room and saw him sitting there, defendant said, "Oh, my God." Defendant then took out his gun and said, "I'd kill you but I know I would go to the place." Norton, who had known defendant and his wife since before they were married, told him to put the gun down and they would talk. Defendant then intentionally fired a shot up into the living room wall. Sharon Zenner told defendant to put the gun away, and Norton said to defendant, "[D]on't take it out on her. It's not her fault."

At that time Norton testified he was seated on the couch and defendant fired either one or two shots from a distance of 10 to 15 feet.

One shot hit him in the chest and spun him around causing his back to be toward defendant. Then 3 more shots were fired, all striking him. One shot grazed his head and he then lay down on the couch, facing the wall. Another struck his left buttock and a third struck underneath his left arm pit. Norton stated that the latter two bullets lodged in his body. The bullet striking his chest exited his side. The next thing he remembered after the shooting was defendant approaching him and saying, "Don't die. Please don't die." He asked defendant to prop his feet up on the couch, cover him up and get him a glass of water, and defendant complied. The record shows that at the time of this trial Norton had a civil lawsuit for damages pending against defendant involving the shooting.

The first police officer to arrive at the apartment testified that defendant had denied shooting anyone. He also stated that Norton's breath smelled of alcohol, and it was stipulated that several police investigators would testify that Norton had told them the following day that he had been intoxicated upon his arrival at Sharon Zenner's apartment.

At trial the officer identified a picture showing 2 bullet holes in the living room wall. One was in the seam of the wall and ceiling, another was approximately a foot below the ceiling. He recalled seeing the one in the seam and a third about 6 to 12 inches above the couch. The officer recovered a .38-caliber revolver and 6 expended cartridges from the apartment.

Eilean Murphy, Sharon Zenner's sister, was baby-sitting for the Zenners' 4-year-old daughter at Sharon Zenner's apartment on the evening of the incident. She testified that she had gone to bed at about 12:30 a.m. and awoke at 4:20 a.m. after hearing a noise which she described as sounding like a big fire cracker or car backfire. The first thing she heard after that was defendant's voice saying, "Look what you made me do, you M____ F____. Now the police are coming." Norton responded, "Why don't we just sit down and talk about it. There's no need to pull a gun out. We could just talk this over." Defendant replied, "You make me so mad I could kill you." She then heard her sister plead with defendant to put the gun down, followed by a series of four or five shots in rapid succession. At the preliminary hearing Eilean Murphy had testified she heard Norton swear at defendant, although at trial she could not remember it.

Defendant, who had been employed as a Chicago police officer for 5 years, testified he arrived at his wife's apartment between the hours of 4 and 5 a.m. on October 4, 1975, after telephoning from a nearby telephone booth about 5 minutes before. Upon entering the apartment he went into his daughter's bedroom and then into the kitchen where he took off his revolver and laid it on the counter. Upon going into the living room he

encountered Norton sitting on the couch. He asked Norton why he was there and told him to leave the apartment. Defendant stated he was surprised to see Norton there because he had trusted him. Norton told him he was no good for his daughter and was causing his wife a lot of problems. Norton then verbally abused him and threatened to throw him out of the apartment. Defendant testified he felt threatened because he was 5 feet 9 inches tall and weighed 165 pounds, while Norton was about 6 feet 2 inches tall and weighed about 240 pounds.

Defendant testified he retreated into the kitchen and picked up his gun so that Norton, who was coming toward him, would not get it first. He also stated he took the gun out of the holster so that he could "shoot it freely" if he had to. After obtaining the gun he believed Norton was going to leave, but Norton grabbed his hand and the first shot went off accidentally, striking the wall near the ceiling. From then on he stated that he and Norton were arguing and struggling for the gun with their arms swinging. Norton continued to vilify him and told him he would make him leave. Defendant stated the five remaining shots were fired during a period of no more than 5 seconds, and he was not aware that Norton had been hit with any of them. He fired the last two shots as far away from Norton as possible, so that the gun would be empty if Norton were successful in taking it from him. It was not his intention to shoot Norton. During the struggle Norton was facing him and they both were struggling for the gun, but defendant's finger was on the trigger. The gun was in front of Norton. Defendant admitted that he may have said something to the effect of "I would shoot you except I know I'd go to the joint."

Sharon Zenner was listed as a potential witness by the State and the defense but did not testify at trial.

## I.

Defendant presents a number of contentions in support of his argument that his guilt was not proved beyond a reasonable doubt. These contentions are: the physical evidence contradicted the version of the shooting presented by the State; the trial court expressed disbelief of that version; the facts support a reasonable hypothesis of innocence; defendant's behavior following the shooting was inconsistent with his guilt; an inference adverse to the State is raised by their failure to call an eyewitness to testify; and the State failed to rebut defendant's claim of self-defense.

The fundamental answer to these contentions is that the testimony of Thomas Norton, which if believed was in itself manifestly sufficient to establish defendant's guilt, was consistent with the physical evidence. Thus there was no need for the State to rebut defendant's exculpatory account further. After some on-the-record deliberations which included

evaluation of the physical evidence the trial judge determined that the victim's version was the believable one. The inferences which defendant seeks to draw from collateral matters such as his behavior following the shooting or the failure of the State to call another eyewitness do not alter the basic fact that the trial court believed Norton's account rather than his. And in doing so the court clearly did not find defendant's hypothesis of innocence to be a reasonable one.

Defendant notes that although four bullets struck Norton while he was on the couch and only two bullets remained in his body no bullet holes were found in the couch. Upon examination of the testimony we find this evidence to be compatible with Norton's account of the shooting. He testified that the first bullet was fired above him towards the wall; then one or two more bullets were fired. One struck him in the chest, spinning him around on the couch and exiting on his side. Three more shots struck him: one grazed his skull, a second struck him under the left armpit, and a third struck him in the buttocks. Thus the two bullet holes near the ceiling in the wall were accounted for by the first bullet fired over the victim and the second bullet which was fired in close succession with the one striking him in the chest. Norton did not know the trajectory of this bullet, indeed, he was not certain whether one or two shots were fired at that time, but the fact that six expended cartridges were recovered also indicates that two shots were fired then. The bullet which grazed Norton in the head after he had been spun around from his seated position clearly could have been the one striking six inches to a foot above the couch. The fact that the bullet to the chest apparently was internally deflected and exited Norton's side would account for the fact that apparently no bullet holes were made in the couch. The bullet could have exited elsewhere into the room or could have become spent and landed on the couch without piercing it.

In colloquy with counsel during final argument the trial court expressed some initial doubts about whether the physical evidence was compatible with Norton's testimony. But the discussion at this point had been muddied by defense counsel's statement, unsupported by the record, that Norton had identified the bullet hole just above the couch as the one made by the first bullet which defendant had fired away from Norton. If counsel's statement had been correct then the bullet subsequently fired which creased Norton's skull would have had to ricochet at a sharp angle up to the ceiling where the other bullet holes were found, an hypothesis with which the trial judge had understandable difficulty. However, in fact Norton had only testified that the first bullet was fired above him into the wall; he had not indicated where it struck. During this colloquy the trial court recalled Norton to the stand and

questioned him, establishing that Norton did not know where the first bullet struck. This negated defense counsel's claim and apparently eliminated the confusion. The trial judge expressed no doubt in finding the defendant guilty of aggravated battery. We find this sequence to be distinguishable from that of *People v. Warren* (1976), 40 Ill. App. 3d 1008, 353 N.E.2d 250, cited by defendant, in which a conviction was reversed because the trial judge had expressed continuous disbelief of the State's account of the crime up to the time he found the defendant guilty.

Defendant also cites those cases in which convictions were reversed because the reviewing courts found the facts to be compatible with a reasonable hypothesis of innocence. Most of those cases involved a conviction based on circumstantial evidence. As was stated in *People v. Wilson* (1948), 400 Ill. 461, 473, 81 N.E.2d 211, 217:

> "It is essential to a conviction upon circumstantial evidence that the facts proved be not only consistent with the defendant's guilt, but that they be inconsistent, upon any reasonable hypothesis, with his innocence."

But in this cause the State relied on the eyewitness testimony of the victim, testimony which the trial court believed. There was no resort to circumstantial evidence. Nor do we find the hypothesis of innocence advanced by defendant, that he shot Norton in self-defense, to be a reasonable one. Defendant testified that he was facing Norton during the entire struggle with the gun in front of Norton. Yet one bullet struck Norton in the rear. Thus the physical evidence actually contradicts defendant's version of the shooting. Following the shooting it was uncontradicted that defendant came to Norton's aid, adjusting his position on the couch and bringing him water. Certainly this is evidence that could be construed to be inconsistent with guilt and thus is a proper factor in evaluating the evidence. (See *People v. Turner* (1973), 13 Ill. App. 3d 1079, 302 N.E.2d 365.) But we do not find this to be a controlling factor. Indeed, there was also testimony that following the shooting defendant initially denied having shot anyone when the police arrived.

■■ One eyewitness not called by the State was the defendant's wife, Sharon Zenner. Defendant asserts that this failure gives rise to the inference that the witness' testimony would have damaged the State's case. The State is not required to produce every witness to a crime, nor does the failure to do so ordinarily create a presumption that the testimony of that witness would be unfavorable to the State. (*People v. Jones* (1964), 30 Ill. 2d 186, 195 N.E.2d 698.) Only under certain circumstances is such a negative inference permissible: for example, where the State fails to call a witness who possesses unique knowledge of a crucial, disputed issue of fact (*People v. Williamson* (1966), 78 Ill. App.

2d 90, 223 N.E.2d 453), or where the government has caused the absence of a material witness. (*People v. Williams* (1968), 40 Ill. 2d 367, 240 N.E.2d 580.) Here there is no contention that Mrs. Zenner possessed unique knowledge of the occurrence. The State chose to rely solely on the victim's testimony. Mrs. Zenner was also listed as a potential defense witness yet they, too, chose not to call her. No negative inference is raised when the witness is also known and available to the defense yet is not called by them. *People v. Farnsley* (1973), 53 Ill. 2d 537, 293 N.E.2d 600; *People v. Mayfield* (1979), 72 Ill. App. 3d 669, 390 N.E.2d 1315.

■■ We find no merit in defendant's contention that the State was required to present additional witnesses to rebut defendant's claim of self-defense. When the State's evidence in its case-in-chief in itself rebuts the affirmative defense raised by the defendant no rebuttal evidence following the assertion of the defense is required. *People v. Pearson* (1972), 4 Ill. App. 3d 462, 281 N.E.2d 422.

■■ In summary we are satisfied that the trial court's ultimate determination of credibility in favor of the State's witnesses was supported by the evidence. Certainly that evidence was not so improbable as to raise a reasonable doubt of defendant's guilt. *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.

## II.

Finally, defendant contends that he was denied due process when the court recalled Norton to the stand and questioned him after final arguments had been made. Although defendant notes that the witness was not admonished of his oath, he does not contend that the witness had not previously been properly sworn. A witness need not be resworn when recalled to the stand in the same trial. (*Salisbury v. Campe-Rose Co.* (1925), 71 Cal. App. 683, 236 P. 174; *State v. Peterson* (1948), 132 W. Va. 99, 51 S.E.2d 78.) Nor do we find that this process deprived defendant of the right to cross-examine the witness. The court did not bar such examination; defense counsel never requested it.

■■ We do not find analogous those cases cited by defendant in which the trial judge was found to have embarked on an improper independent investigation. Thus, in *People v. Harris* (1974), 57 Ill. 2d 228, 314 N.E.2d 465, the trial judge questioned the defense attorney about prior statements made by the defendant which were outside of the record. In *People v. Wallenberg* (1962), 24 Ill. 2d 350, 181 N.E.2d 143, the trial judge expressly relied on his personal knowledge, unsupported in the record, to convict the defendant. Here the examination on the record was of a witness who had already testified in the cause and was made only after the court asked counsel if they objected. No objection was made. Under these

circumstances we find that the procedure was proper and did not prejudice the defendant.

The judgment of the trial court is affirmed.

Affirmed.

LINN, P. J., and JOHNSON, J., concur.