THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
NATHAN YOUNG, Defendant-Appellant.

First District (2nd Division)   No. 1—87—2215

Opinion filed August 29, 1989.

Paul P. Biebel, Jr., Public Defender, of Chicago (Thomas N. Swital, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Marie

Quinlivan Czech, and William D. Carroll, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

Defendant Nathan Young was indicted on two counts of murder and one count of armed violence in connection with the fatal shooting of Theodore Grimes on July 12, 1986. Following a bench trial, defendant was found guilty of murder and armed violence and sentenced to imprisonment for concurrent terms of 32 years for murder and 30 years for armed violence.

On this appeal, defendant claims that (1) the trial court erroneously permitted a State's witness to testify in violation of the court's order excluding witnesses from the courtroom during the trial; (2) the State failed to prove beyond a reasonable doubt that defendant did not act in self-defense; (3) the evidence at most supports a conviction for voluntary manslaughter; (4) the evidence does not support separate convictions for both murder and armed violence; and (5) the trial court erroneously considered victim impact statements at sentencing.

At approximately 11:30 p.m. on July 12, 1986, defendant shot and killed Theodore Grimes. Just moments before the killing, an altercation involving defendant's brother, William Young, occurred on the corner of 113th and May Street in Chicago. Cornelius Lyons and Andrew McKinney both testified that at approximately 11:30 p.m. on July 12, 1986, they met Grimes and a third person named Fred on the corner of 113th and Morgan Street. The four of them walked down 113th Street on their way to a party at 116th and Hale Street. When they reached 113th and May Street, they encountered William Young and two other men named Hank and Jerry standing on the corner.

McKinney and Hank engaged in an oral altercation, after which William Young told McKinney that McKinney "ain't tough." McKinney replied "I know I'm not tough," and William Young then pulled out a gun and started shooting. McKinney then told William Young that he would "kick his ass" because William Young was firing blanks. At that point, William Young, using either another gun or the same gun with bullets in it, pointed the gun at McKinney's head. McKinney said "[g]o ahead, make my day" and William Young then shot McKinney in the shoulder.

The group, including Lyons, McKinney and Grimes, then walked six blocks to a bench in Ada Park. There, McKinney told Robert Wright that he was hurt and Wright asked if he wanted to be taken to the hospital. McKinney said yes but then asked Lyons to get Lyons' father to take him to the hospital.

As Lyons was walking away to get his father, defendant "came up running" and shot Grimes in the face. Grimes had been sitting on top of the bench, fell off the bench after he was shot, and then crawled on the ground. After shooting Grimes in the face, defendant fired shots at Lyons and McKinney, walked "right up over" Grimes, shot Grimes in the head, and then ran away. McKinney testified that he grabbed a bottle and threw it at defendant as defendant was running away.

After the police arrived, Lyons took them to defendant's house on Aberdeen Street and identified defendant as the person who shot Grimes.

Robert Wright testified that he was "shooting craps by a bench in Ada Park" at the time of the Grimes shooting. Wright saw defendant pull out a gun and shoot Grimes, and then saw Grimes "stumble[]" over the bench he had been sitting on. Wright ran away after Grimes was shot and heard "several" more shots as he was running. On cross-examination, Wright testified that he had spoken with a man named Carl Thomas in the lockup on May 20, 1987 and told Thomas that defendant had killed one of "his partners." Wright denied that he had told Thomas that defendant had killed one of his "folks."

Michael Draine testified that he was "shooting dice" in Ada Park on the night of the Grimes shooting, at a distance of approximately 30 feet from the bench where Grimes had been sitting. Draine saw Lyons, McKinney, Grimes and "another guy named Fred" near the bench. Draine also saw McKinney bleeding from the shoulder and talking with Robert Wright. Draine heard some shots, saw defendant standing behind Wright and Grimes, and then saw Grimes fall after he "jump[ed]" over a bench. According to Draine, defendant stood over Grimes, shot Grimes again in the head, and only then started "firing shots at everybody." Draine did not see anyone throw a bottle at defendant.

Chicago police officer Thomas Reid testified that on July 12, 1986, he responded to a call of shots fired in Ada Park and saw Grimes lying on the ground. Lyons and Draine took Reid and his partner to defendant's house, where Lyons identified defendant as the man who shot Grimes. Reid prepared a police report approximately 1½ hours after defendant was arrested and also after he had interviewed Lyons and Draine. Reid's report states that defendant shot McKinney rather than Grimes.

Gail Turnstall testified for the defense. Turnstall was in the lockup with Robert Wright on May 20, 1987. Turnstall testified that Wright told him that defendant had killed "one of his [Wright's]

folks" and that they would "get Nathan Young either here or when he get [sic] to the penitentiary." At the time of his conversation with Wright, Turnstall was familiar with defendant's case and had been defendant's cell mate in jail. Turnstall had been sentenced to the penitentiary for violation of probation for robbery.

Chicago police officer Daniel McWeeny also testified for the defense. McWeeny had interviewed Lyons, McKinney and Draine regarding the Grimes shooting. According to McWeeny, Lyons said that defendant had shot McKinney in the arm and jumped over a park bench and shot Grimes; McKinney said that gang threats were exchanged on the night of the Grimes shooting and that defendant told Grimes "I got you now" and then started shooting; and Draine said that he saw Grimes run and trip over a park bench before he was shot. McWeeny also testified that he spoke over the telephone to Glenn Gibson, an investigator from the coroner's office, and told Gibson that defendant had stated that Grims "threw a bottle at him, so he shot him." According to McWeeny, defendant was the only person who said anything about a bottle.

Defendant then testified that at approximately 11:30 or 11:45 p.m. on July 12, 1986, he was walking alone through Ada Park. He passed six people standing in a group and, from a distance of 15 or 20 feet, heard one of them say "[t]here's his brother" and heard another say "[l]et's get him." Defendant was then hit in the back of the leg with a bottle. As the group approached him, defendant got scared and pulled out a gun, displaying it at chest level as a warning.

Defendant testified that the group "continued to approach" him and that, after he "realized they wasn't [sic] going to stop[,]" he fired "towards the closest one." He fired two shots and then saw "one guy go down as if he had tripped or something" about one or two feet in front of him. Defendant fired again "towards the ground" because he could not tell if the person who fell had been hurt or if he had a weapon and also because he had been told previously that it is not painful to be shot with a .22 caliber gun. Finally, defendant claimed that after he fired the shot towards the ground, he fired a few shots at the rest of the group and then ran home. On cross-examination, defendant admitted that he denied any involvement in the shooting when he initially spoke with the police.

The final witness for the defense was Glen Gibson, the investigator from the coroner's office who had spoken with Officer McWeeny on the telephone. Gibson testified that McWeeny told him defendant had stated that he shot Grimes because Grimes threw a bottle at him.

After closing arguments, the trial court found defendant guilty as

charged. On July 2, 1987, the trial court denied defendant's motion for a new trial and proceeded to hear arguments in aggravation and mitigation. Over defendant's objection, the trial court allowed the State to present two victim impact statements, one by Grimes' stepfather and the other by Grimes' mother. The trial court sentenced defendant to concurrent terms of 32 years for murder and 30 years for armed violence. However, the written sentencing order indicates that the two terms are to run consecutively.

I

Defendant maintains that the trial court erroneously permitted Andrew McKinney to testify because McKinney was in the courtroom during a portion of Cornelius Lyons' testimony, despite the trial court's order excluding witnesses from the courtroom during the trial. Defendant claims that McKinney had been in the courtroom for approximately 10 minutes listening to Lyons' testimony and had overheard Lyons' testimony regarding the locations of the shooting incidents. Defendant argues that the trial court abused its discretion in allowing McKinney to testify because McKinney had the opportunity to conform his testimony to that of Lyons.

■ Where the trial court has ordered witnesses excluded from the courtroom during the trial, it is within the discretion of the court to allow the testimony of a witness who has violated that exclusion order. (*People v. Gibson* (1969), 42 Ill. 2d 519, 525, 248 N.E.2d 108.) The trial court's decision to allow the witness to testify will not be disturbed on appeal absent an abuse of that discretion. (*People v. Wiatr* (1983), 119 Ill. App. 3d 468, 473, 456 N.E.2d 686.) The burden of proof is on the party alleging error to show prejudice resulting from the trial court's decision to allow the witness to testify. *People v. Wiatr*, 119 Ill. App. 3d at 474; *People v. Johnson* (1977), 47 Ill. App. 3d 362, 369, 362 N.E.2d 701.

In this case, McKinney had been down the hall testifying in another courtroom before entering the courtroom where defendant was on trial. McKinney's presence in the courtroom was discovered shortly after defense counsel began cross-examining Lyons. The prosecution promptly notified the trial court of McKinney's presence. McKinney was immediately removed from the courtroom and Lyons then concluded his testimony. The State called McKinney as its next witness and defense counsel objected to him testifying. The trial court asked McKinney how long he had been in the courtroom and what he had heard. McKinney stated that he had been in the courtroom for 10 minutes and heard Lyons testify only to where Lyons met McKinney,

where Lyons was when McKinney was shot, and where Lyons went afterwards. After noting that Lyons' entire testimony lasted approximately one hour, the trial court asked McKinney if he understood that he was to testify only as to his own observations based on his own recollection. McKinney replied in the affirmative and was then permitted to testify.

■ Defendant plainly was not prejudiced by McKinney's testimony. A review of the record indicates that the only testimony McKinney overheard was testimony elicited on cross-examination that Lyons met McKinney on the corner of 113th and Morgan, intending to go to a party at 116th and Hale. When McKinney testified on direct examination, he also stated that he met Lyons on the corner of 113th and Morgan, intending to go to a party at 116th and Hale. However, McKinney testified further that the party was being given by one of his ex-girlfriends, a statement not elicited from Lyons on cross-examination. This suggests that McKinney gave his own account of his intention to go to a party that night and did not conform his testimony to that of Lyons. Even if McKinney had conformed his testimony to that of Lyons, defendant was not prejudiced by McKinney's testimony, because McKinney plainly gave his own account of the shooting incidents and the events that occurred in Ada Park.

## II

Defendant maintains next that the State failed to prove beyond a reasonable doubt that he did not shoot Grimes in self-defense. Defendant claims that the State's proof was unsatisfactory because of inconsistencies (1) between Lyons' and McKinney's testimony regarding what McKinney said during the altercation on the corner of 113th and May; (2) between Lyons' and McKinney's testimony regarding whether any gang threats were exchanged; (3) in Lyons' testimony regarding who shot McKinney; (4) between Lyons' and Draine's testimony regarding when they saw defendant in Ada Park; (5) between the testimony of Lyons and McKinney on the one hand, and Draine on the other hand, regarding whether Grimes fell off or jumped over the bench after he was shot; (6) between McKinney's and Wright's testimony regarding whether McKinney was sitting or standing when defendant appeared; (7) regarding whether defendant fired at the group before or after shooting Grimes the second time; (8) in the evidence regarding whether defendant turned Grimes over before shooting him again; (9) in the evidence regarding the distance from which Grimes was shot; and, finally, (10) between Officer Reid's report and the testimony of the other witnesses regarding whether defendant

shot McKinney, rather than Grimes.

Defendant maintains that, contrary to the testimony of the State's witnesses, his own account of the shooting incident was clear, convincing, and corroborated. Defendant notes in particular that Glenn Gibson, the investigator in the coroner's office, testified that Detective McWeeny told him, consistent with defendant's self-defense theory, that defendant had stated he shot Grimes after Grimes threw a bottle at him. Defendant maintains further that the State's version of the events is "nonsensical" and "contrary to human experience" because the fact that William Young, defendant's brother, was not injured by McKinney and his group meant that defendant did not have any motive to retaliate, and because one person would not "go out after a group of gang members who are hanging out in a park at that hour of the night." Defendant argues that it is easier to believe McKinney's group would retaliate against defendant for the attack by William Young.

■ Self-defense is an affirmative defense (Ill. Rev. Stat. 1985, ch. 38, par. 7—14), and once it has been raised by the defendant, the State has the burden of disproving it beyond a reasonable doubt. (*People v. Woods* (1980), 81 Ill. 2d 537, 542, 410 N.E.2d 866.) Whether an otherwise criminal act is justified under the law of self-defense depends on all the surrounding facts and circumstances of the case and is to be determined by the trier of fact. *People v. Woods* (1980), 81 Ill. 2d 537, 542, 410 N.E.2d 866.

■ In a bench trial, it is the function of the court to determine the credibility of the witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence. (*People v. Berland* (1978), 74 Ill. 2d 286, 305-06, 385 N.E.2d 649.) The trier of fact is not required to believe the defendant's version of the events. (*People v. Lester* (1981), 102 Ill. App. 3d 761, 766, 430 N.E.2d 358; *People v. Liddell* (1975), 32 Ill. App. 3d 828, 830, 336 N.E.2d 815.) Rather, in weighing the defendant's version of the incident, the trier of fact should consider the probability or improbability of the defendant's account, the circumstances surrounding the crime and the relevant testimony of other witnesses. (*People v. Lester* (1981), 102 Ill. App. 3d 761, 766, 430 N.E.2d 358; *People v. Walden* (1976), 43 Ill. App. 3d 744, 749, 357 N.E.2d 232.) The court's determination will not be disturbed on appeal unless it is palpably erroneous. *People v. Lester* (1981), 102 Ill. App. 3d 761, 767, 430 N.E.2d 358.

In this case, defendant was the only witness who testified that a bottle was thrown before the shooting or that anyone said "[t]here's his brother" and "[l]et's get him." On the other hand, the State's wit-

nesses testified that they saw defendant shoot Grimes in the face. Lyons, McKinney, and Draine testified that they saw defendant shoot Grimes a second time in the head after Grimes had fallen off the bench and was crawling on the ground. Only Draine testified that defendant fired at the crowd after the second shot to Grimes' head. The other witnesses testified that defendant fired into the crowd between the first shot to Grimes' face and the second shot to Grimes' head. Finally, defendant's account of the shooting incident is unconvincing because it is improbable that defendant happened to be strolling through the park; that his initial shots, fired to scare off his assailants, both happened to strike Grimes in the head; and that he shot Grimes again because he did not think a .22 caliber gun could have hurt Grimes.

The trial court heard the testimony and did not believe defendant's account of the shooting incident. The trial court also considered the discrepancies in the testimony of the State's witnesses in weighing that testimony. The trial court concluded that there was sufficient evidence presented at trial to disprove beyond a reasonable doubt that defendant shot Grimes in self-defense. Given the evidence presented that defendant walked over to where Grimes was crawling on the ground and shot him in the head, the trial court's finding is not palpably erroneous and will not be disturbed on appeal.

### III

Defendant maintains that the evidence at most supports a conviction for voluntary manslaughter. Defendant argues that the only credible account of the Grimes shooting was his own testimony at trial that he acted in self-defense. Defendant maintains that, even if the State proved beyond a reasonable doubt that he did not act in self-defense, the trial court should have found that he acted unreasonably in defending himself.

Voluntary manslaughter is the intentional or knowing killing of another committed under an unreasonable belief that deadly force is necessary. (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(b).) Thus, voluntary manslaughter is similar to the defense of self-defense in that both involve defendant's subjective belief at the time of the killing that deadly force was justified. The difference is the reasonableness of that belief. If the trier of fact finds that the defendant did not act in self-defense, but nevertheless finds that the defendant acted under a belief, albeit unreasonable, that force was justified, then the crime will be reduced from murder to voluntary manslaughter. (*People v. Eshaya* (1986), 144 Ill. App. 3d 757, 763, 494 N.E.2d 772.) However,

the reviewing court will not reduce a conviction for murder to voluntary manslaughter where the trier of fact has reasonably concluded that the defendant had no basis whatsoever for his belief that deadly force was necessary to protect his own life. *People v. Eshaya* (1986), 144 Ill. App. 3d 757, 763, 494 N.E.2d 772.

In *People v. Eshaya* (1986), 144 Ill. App. 3d 757, 494 N.E.2d 772, for example, the court rejected the defendant's argument that his conviction for murder following a jury trial should be reduced to voluntary manslaughter on the ground that he unreasonably believed that deadly force was justified. In that case, the State's witnesses testified that the victim and his fellow gang members were unarmed when the defendant shot the victim from a distance of 20 feet. The defendant claimed that the victim and his fellow gang members were armed with baseball bats, knives, and pool cues. The jury found the defendant guilty of murder. On appeal, the court refused to reduce defendant's conviction to voluntary manslaughter, because the jury could have reasonably concluded that there was no justification whatsoever for defendant's use of deadly force.

In this case, the State's witnesses testified that defendant approached Grimes, shot him in the face, fired several shots at other people nearby, and, finally, walked over to where Grimes was crawling on the ground and shot him again in the head. Defendant testified that he was "scared" and, like the defendant in *Eshaya*, believed that Grimes and others were armed. However, it is plain that the trial court did not credit defendant's testimony. Rather, in finding defendant guilty of murder, the trial court concluded that there was no basis whatsoever for defendant's alleged belief, reasonable or unreasonable, that deadly force was necessary to protect his own life. That conclusion is not palpably erroneous, because it is consistent with the evidence presented at trial and contrary only to defendant's own testimony. Accordingly, as in *Eshaya*, defendant's conviction for murder will not be reduced to voluntary manslaughter.

## IV

Defendant maintains that his armed violence conviction must be vacated because his convictions for murder and armed violence were based on the same acts. Defendant argues that only one conviction was permissible because "there was only one murder victim and only one act of murder." Defendant also maintains that the sentencing order incorrectly indicates that he was sentenced to consecutive terms of imprisonment. Defendant argues that because his armed violence conviction must be vacated, and because the sentencing order is incor-

rect, his case should be remanded for resentencing.

In *People v. Myers* (1981), 85 Ill. 2d 281, 426 N.E.2d 535, the Illinois Supreme Court held that the defendant's conduct consisted of separate physical acts and supported convictions for attempted murder and armed violence. In that case, the evidence at trial established that the defendant first cut the victim's neck with a machete, then cut another person's fingernail, and finally moved the machete back to the victim's neck and severed the victim's windpipe with a "pretty hefty yank."

■ In this case, the two offenses were likewise based on separate acts. Three State's witnesses testified that defendant first shot Grimes in the face, then fired at a crowd in a different direction, and, finally, walked over to where Grimes was crawling on the ground and shot him in the head. The initial shot to Grimes' face and the second shot to Grimes' head were distinct physical acts because, just as the two cuts to the victim's neck in *Myers* were separated by the cutting of another person's fingernail, the two shots in this case were separated by the intervening act of firing at Lyons and McKinney. It follows that the evidence supports convictions and concurrent sentences for murder and armed violence. However, as both parties agree, the written sentencing order should be clarified to indicate that defendant received concurrent terms of imprisonment.

## V

Finally, defendant maintains that the trial court erred in considering victim impact statements at his sentencing hearing. Specifically, defendant notes that in *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, the Supreme Court held that victim impact statements may not constitutionally be considered in aggravation at capital sentencing hearings. Defendant asserts that this court extended *Booth* to noncapital sentencing hearings in *People v. Fellela* (1st Dist. 1987), No. 85—3515 (unpublished order under Supreme Court Rule 23).

■ However, the victim impact statements were properly considered at sentencing under the Illinois Bill of Rights for Victims and Witnesses of Violent Crimes Act (Ill. Rev. Stat. 1985, ch. 38, par. 1401 *et seq.*). In *Booth*, the United States Supreme Court held that victim impact statements may not constitutionally be introduced at sentencing in capital cases. However, the court expressly stated that its holding did not preclude the use of victim impact statements in noncapital cases. Indeed, the Illinois Supreme Court recently decided in *People v. Turner* (1989), 128 Ill. 2d 540, 539 N.E.2d 1196, that vic-

tim impact statements may constitutionally be considered as factors in aggravation at non-capital sentencing hearings. Even before *Turner* was decided, this court declined to extend *Booth* to noncapital sentencing hearings in *People v. Scott* (1989), 180 Ill. App. 3d 418. Finally, defendant's reliance on *Fellela*, a Rule 23 order, is entirely misplaced.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. We remand to the trial court for the limited purpose of correcting the written sentencing order to indicate that defendant received concurrent terms of imprisonment.

Affirmed and remanded.

HARTMAN and SCARIANO, JJ., concur.