THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOB AYALA, Defendant-Appellant.

First District (2nd Division) No. 1—88—1694

Opinion filed December 31, 1990.

Randolph N. Stone, Public Defender, of Chicago (Julie M. Campbell and James H. Reddy, Assistant Public Defenders, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Joseph Brent, and David Stabrawa, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant Job Ayala (Ayala) appeals from his convictions of attempt (murder), aggravated battery (using a deadly weapon), aggravated battery (causing great bodily harm) and armed violence.

Ayala claims that he was not afforded due process of law because: his trial was unfair; the State failed to prove beyond a reasonable doubt that he was guilty of one count of aggravated battery (causing great bodily harm); and his shooting of one victim could not support a conviction for both armed violence and for attempt (murder). Ayala also claims that the order sentencing him improperly records that he was convicted of three counts of attempt (murder).

The charges against Ayala stemmed from the May 13, 1987, shootings of Julio Figueroa (Figueroa), Victor Villasenor (Villasenor) and Adolpho Mercado (Mercado). Ayala was charged with, and tried before a jury on, three counts of attempt (murder), three counts of aggravated battery (causing great bodily harm), three counts of aggravated battery (using a deadly weapon) and three counts of armed violence

predicated upon aggravated battery (causing great bodily harm)—one count for each victim. At trial, all three victims testified that on May 13, 1987, they were crossing a street in Chicago when they saw a group of 10 to 15 youths approach from a nearby viaduct flashing the hand signal of the Imperial Gangsters, a street gang, and making other hand signals derogatory of the Latin Kings, another gang, while yelling "K.K.," meaning "King Killer."

Villasenor testified that the viaduct from which the group of youths had come was a "neutral zone" between the territories of two gangs, the Latin Kings and the Imperial Gangsters. After yelling and gesturing at the three boys for less than a minute, the group of youths became quiet, at which point, according to Villasenor, the youths were looking behind the three boys. When Villasenor turned around to see what they were looking at, he saw Ayala wearing a hooded sweatshirt. Ayala then pulled a gun from his pocket, grinned at the three boys and walked toward them. Villasenor further testified that Ayala walked up to Figueroa, said to him, "K.K., I'm going to kill you," and pulled a mask down over his face. Villasenor began to run away, then heard two shots. As he began to climb a gate, Villasenor felt a gun at his back, turned around and saw Ayala fire the gun. Villasenor fell to the ground, turned and saw Ayala fire at Mercado. Figueroa ran toward Villasenor and attempted to aid him, but Villasenor, who couldn't run because of his wound, told Figueroa to go on. The police and an ambulance arrived shortly thereafter and Villasenor was taken to Illinois Masonic Hospital, where he underwent surgery for a gunshot wound which caused a genital urinary tract injury, a hole in his bladder and abdominal wall muscle damage.

Mercado, who was 14 years old at the time of the shooting, testified that while he didn't turn around when the approaching youths fell silent, he did so when he heard the shot fired at Figueroa, who was behind him. When he turned around, Mercado saw Villasenor get shot while trying to climb a gate. Mercado, who began to run away, heard two more shots, the second of which entered the back part of his thigh and exited through the front. Subsequent to his being shot, Mercado was taken to a hospital, where his wound was cleansed, and he was released about a half hour later. Mercado testified that he never saw the face of the person who fired the shots.

Figueroa, who was 16 years old at the time of the shooting, testified that he looked back when he saw Villasenor look back, at which time he saw Ayala holding a gun in his hand. Figueroa testified that Ayala was grinning, but then pulled a mask down over his face and said, "I'm going to kill you." Ayala put the gun to Figueroa's chest,

but Figueroa knocked it away. Ayala then fired the gun, shooting Figueroa on his left side. Figueroa went down, then ran about three steps before turning and seeing more people by the viaduct with the original group. He was then shot in the right arm. Figueroa then turned around and saw Villasenor on the ground. After he heard two more shots fired, he attempted to help Villasenor; but when Villasenor collapsed, he left him and continued to run. Figueroa was treated for his wounds at a hospital and was later treated for an infection resulting from the first wound. He further testified that over the two-year period preceding the shooting he had seen Ayala more than 30 times, making gang signals at a nearby bus stop to people on the buses. He also saw Ayala at about 4 p.m. on the day of the shooting, riding a bicycle under the viaduct from which the large group seen by the victims had come.

David Sobczyk (Sobczyk), called by the State as a gang crimes specialist for the Chicago police department and assigned to the area in which the shootings took place, testified that he helped investigate various gang-related criminal activities and maintained records on street gangs, including the Imperial Gangsters and the Latin Kings. Sobczyk stated that in his opinion, Ayala was a member of the Imperial Gangsters, basing that opinion upon his knowledge of the meaning of the various hand signals used during the events prior to the shooting. He also testified that "K.K." means "King Killer." Sobczyk testified that prior to the May 13 shootings, he observed Ayala in the area with several other persons, two of whom were leaders of the Imperial Gangsters. Sobczyk also related that the area in which he saw Ayala with these persons was within the territory of the Imperial Gangsters.

Sobczyk learned of the shooting soon after it occurred; he then went to the scene of the crime and interviewed witnesses. At 9 p.m. on the day of the shootings, Sobczyk interviewed an individual who claimed to have witnessed the incident, and who told him that Ayala was the assailant. Based upon that conversation, Sobczyk returned to his office and retrieved a photo identification book which contained pictures of Imperial Gangsters. Sobczyk never wrote down the name of the eyewitness with whom he spoke; he testified, however, that the witness was a male, and although he told his superior the name of the witness, he did not make a record of it. Sobczyk took the photo identification book to Figueroa's home. Earlier, while in the hospital, Figueroa had been shown pictures from photo books by other officers, but hadn't identified anyone as his assailant. While perusing the photo book provided him by Sobczyk, Figueroa first pointed to an individual

later identified as David Quinn and commented that the person pictured looked like his assailant. Figueroa then turned to the photo of Ayala and identified him as his assailant. Sobczyk recorded the identification as "tentative."

After Figueroa's identification of Ayala, Ayala was arrested at his home. Sobczyk took a photograph of Ayala at the police station and put together a photo array that included the photo of Ayala and four similar-looking persons. Sobczyk took the photo array to the hospital where Villasenor was being treated and showed it to him. Villasenor recognized four of the photographed persons as gang members and pointed out Ayala as his assailant. Sobczyk then returned to Figueroa's home with the photo array, and Figueroa identified the picture of Ayala as that of his assailant. On May 14, 1987, Figueroa was shown the photo array about two hours prior to viewing and identifying Ayala in a police lineup.

Ayala's defense consisted of the testimony of four Chicago police officers. One officer testified that while investigating the crime, he received a telephone call in which he was told that Figueroa had identified David Quinn as his assailant. Another officer, who spoke with Villasenor at the scene of the crime, testified that Villasenor was clutching his stomach and screaming and that he didn't remember whether Villasenor told him that there was only one or that there were two assailants.

Ayala requested during the instruction conference that the jury be instructed:

> "Where an individual has knowledge of the facts and is accessible to a party but is not called by that party, a presumption arises that his testimony would be adverse to that party, if the witness was not equally available to the defendant."

The court denied the instruction on the ground that the State did not know the identity of the witness who led Sobczyk to believe that Ayala was the assailant, despite Sobczyk's having turned in the witness' name to a superior. The court held that the witness was not available to the State. The court further held that the names of the police officers other than Sobczyk who had shown photo identification books to Figueroa while he was in the hospital were neither known nor accessible to the State.

Ayala was found guilty of all charges with the exception of the attempt (murder) of Adolpho Mercado, of which he was acquitted. He was sentenced to 30 years in the custody of the Illinois Department of Corrections on each of the two attempt (murder) convictions, 30 years on each of the three armed violence convictions and five years on

each of the three convictions for aggravated battery (using a deadly weapon), all sentences to run concurrently. Ayala was not sentenced on his three convictions for aggravated battery (causing great bodily harm) because they were held to be lesser crimes included within the armed violence convictions.

Ayala's first claim is that the trial court improperly admitted references to his involvement in gang activity during the State's opening and closing arguments, and as evidence during his trial. He contends that such evidence was irrelevant to the issue of identification of the assailant, and that it prejudiced the jury, thus denying him a fair trial. The State replies that the evidence was relevant to prove Ayala's motive for committing the crime—that he was acting as part of a gang. The State also maintains that the evidence was relevant to make understandable the gang symbols made by Ayala and his group when the three victims faced them on the street. Any prejudice to him at trial, the State argues, was outweighed by the relevance of the evidence.

■■ Evidence of a defendant's involvement in gang activity is regarded as prejudicial for the reason that such evidence may lead to the defendant's conviction "merely because of his membership in an organization that is unpopular." (*People v. Hairston* (1970), 46 Ill. 2d 348, 372.) As a result, "proof of membership is admissible only if there is also sufficient proof to show that membership is related to the crime charged, for example, to show common design or purpose." (46 Ill. 2d at 372.) The court in *Hairston* found evidence that the defendant was a high-level gang member admissible despite being prejudicial, because the evidence was relevant to the accusation that the defendant had ordered another gang member to kill the victim: the defendant's status lent credibility to the State's theory that another gang member would obey his orders. 46 Ill. 2d at 372.

■ We agree with the State that evidence of Ayala's gang membership was relevant for the purpose of proving the motive for the attack and that, therefore, the trial court did not abuse its discretion in admitting the evidence. The court in *People v. DeSavieu* (1973), 11 Ill. App. 3d 529, 534-35, held evidence of gang membership admissible when it helped "prove the motive of the defendant." The evidence, it said, provided "an explanation for the seemingly inexplicable attack." See also *People v. Rivera* (1986), 145 Ill. App. 3d 609, in which evidence of the defendant's gang membership was held relevant to show the motive for the killing of a victim who had been selling drugs in territory belonging to the defendant's gang; the evidence was admissible despite the prejudice caused to the defendant. 145 Ill. App. 3d at 618.

In the case *sub judice*, evidence that Ayala belonged to the Imperial Gangsters helped prove the motive for shooting the three victims, who were facing a group of persons identifying themselves as Imperial Gangsters, and assisted in clarifying Ayala's reference to "K.K.," before the shootings.

Ayala contends that the case at bar is analogous to *People v. Gonzalez* (1989), 188 Ill. App. 3d 559, where, in being interviewed by the police, the victim said that he thought his assailant was a "Spanish Cobra," and identified him from photo albums which contained photographs of "self-admitted Spanish Cobra gang members." The court held inadmissible the introduction of evidence of gang affiliation to show the procedure and circumstances leading to the defendant's identification. We find *Gonzalez* to be inapposite, for the evidence of gang affiliation in that case was unrelated to the criminal act, but relevant only to the method by which the victim identified and the police found the defendant. Here, however, the evidence showed a motive for what would otherwise appear to be a random and inexplicable attack. We hold, therefore, that the trial court did not abuse its discretion in admitting evidence of Ayala's gang affiliation.

Ayala's second claim is that the trial court erroneously accepted Sobczyk as an "expert witness" and erred also in admitting his testimony about Ayala's gang affiliation, maintaining that Sobczyk was not qualified as a "gang crimes expert." Sobczyk's testimony is further alleged by Ayala to have been irrelevant to the issue of identification and prejudicial to his right to a fair trial. The State responds that Sobczyk's training and experience qualified him as a "gang crimes expert," and that his testimony about Ayala's gang affiliation was relevant to prove Ayala's motive for the crime.

A witness qualifies as an expert if "because of his skill, training, or experience, he is better able to form a more accurate opinion as to the matter under consideration than is an ordinary person." (*People v. Jackson* (1986), 145 Ill. App. 3d 626, 633-34.) The *Jackson* court, holding admissible a police officer's "expert" opinion that the defendant was a gang member, stated that specialized formal training was unnecessary, that experience alone could qualify one as an expert, and that as long as the testimony is based upon information of the "type reasonably relied upon by experts in the field," it would be proper to admit it. 145 Ill. App. 3d at 633-34. See also *People v. Douglas* (1989), 183 Ill. App. 3d 241, 254.

While Sobczyk's two years of experience in the neighborhood where the crime occurred was not as extensive as the five years had by the officer in *Jackson*, the record justifies the trial judge's conclu-

sion that Sobczyk possessed a greater knowledge of gang activity than would be available to the average person. Moreover, Sobczyk, like the officer in *Jackson*, was active in the investigation of gang crimes and other gang activity in the area; indeed, he was a specialist in the field. The court in *Jackson* deemed such experience sufficient upon which to base an expert opinion. Accordingly, inasmuch as Sobczyk's testimony qualifies as expert opinion, and since, as we have already held in connection with defendant's first issue, that testimony relating to gang affiliation was relevant here, and further because we agree with the trial judge as to this and the previous issue raised by defendant that the probative value of the testimony as to gang membership outweighs its prejudicial effect, we hold that the trial court did not abuse its discretion in admitting Sobczyk's testimony.

Ayala's third claim is that during the State's closing and rebuttal arguments, the prosecutor misstated Sobczyk's testimony and also played upon the jurors' fears of gang violence in arguing that they should convict Ayala. The State responds that Ayala, by objecting to only two of the allegedly improper statements at trial, and by not mentioning any of them as issues in his post-trial motion for a new trial, has waived review of them on appeal.

In closing argument, the State implied that it might be possible that witnesses to whom Sobczyk had spoken after the crime were not in court because they were afraid to come to court. Ayala did not object to this statement. During its rebuttal argument, the State incorrectly told the jury that the eyewitness who identified Ayala to Sobczyk as the perpetrator of the crime "could be a mother with children." The court sustained Ayala's objection to that remark and admonished the State to continue its argument "based upon the evidence."

In his post-trial motion for a new trial, Ayala claimed only generally that "the court allowed the prosecution to engage in improper argument." The issue was not argued at all during the hearing on Ayala's motion.

 █ Ordinarily, this court does not review errors alleged to have occurred during trial unless the defendant both objects to the error at trial and raises the issue in a written post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186; *People v. Fields* (1990), 135 Ill. 2d 18, 55.) Because Ayala did not properly preserve for review the issue of the propriety of the statement that witnesses may have feared to come to court, review of that issue would generally be waived. See also *People v. Cox* (1990), 197 Ill. App. 3d 1028, 1036.

Even when a statement is properly objected to at trial, as was the

assertion that an eyewitness to the crime "might be a mother with children," it is not considered to be properly preserved in a post-trial motion if it is not raised with enough specificity to afford the trial court the "opportunity to rule on the issue presented for review." (*People v. Turk* (1981), 101 Ill. App. 3d 522, 533 (supplemental opinion on denial of rehearing).) In *Turk*, the court held that a post-trial claim that "arguments were inflammatory, prejudicial *** and [violated the right to counsel and encouraged the jury to convict based upon constitutionally inadmissible matters]" (101 Ill. App. 3d at 530) was not sufficient to meet the standard of specificity set forth in *Brown v. Decatur Memorial Hospital* (1980), 83 Ill. 2d 344, 349-50.

Ayala raised the issue of the State's improper rebuttal argument with even less specificity than that with which it was raised in *Turk*. When combined with the failure to even discuss the issue during the hearing on Ayala's post-trial motion, we conclude that pursuant to *People v. Enoch* (1988), 122 Ill. 2d 176, 186, review of the issue would generally be waived. See also *People v. Harris* (1990), 196 Ill. App. 3d 663, 674-75 (lack of specificity in post-trial motion waives issue pursuant to *Enoch*).

Even if an issue is generally waived, however, Supreme Court Rule 615(a) (107 Ill. 2d R. 615(a)) allows this court to notice "[p]lain errors or defects affecting substantial rights *** although they were not brought to the attention of the trial court." The "plain error rule," however, is not applied unless "the evidence is closely balanced or the error is of such magnitude that the commission thereof denies the accused a fair and impartial trial." *People v. Young* (1989), 128 Ill. 2d 1, 47.

But the evidence in this case is not closely balanced. The State's case was based upon the eyewitness account of two of the victims, one of whom recognized Ayala from having seen him on several occasions before and during the commission of the offenses, and both of whom identified Ayala before and during trial. Their testimony, furthermore, was not impeached, and the case was not otherwise complicated by conflicting evidence. Finally, the trial court sustained Ayala's objection to the remark made during rebuttal argument, admonished the State to argue according to the evidence and instructed the jury to disregard statements in closing argument to which objections were sustained. (See, *e.g., People v. Scott* (1990), 194 Ill. App. 3d 634, 645 (the provision of such a jury instruction is a factor in determining the prejudicial effect of improper comments).) We hold, therefore, that any error resulting from the State's comments was not plain error, and review of the issue has therefore been waived.

Ayala's fourth claim is that the trial court erred in failing to instruct the jury, as he requested, that it could draw an adverse presumption from the State's failure to call witnesses available to the prosecution. Ayala contends that there was evidence to support such an instruction, and further argues that there was evidence that an eyewitness to the shootings had knowledge of a disputed factual issue, but that despite being available to the prosecutor, the witness was not called by the State.

The State responds by maintaining that the confrontation clause of the sixth amendment to the United States Constitution does not require it to disclose the identity of an eyewitness who was only a "tipster." The State claims that because the witness was found to be inaccessible to the State, it was not required to disclose the witness' identity to Ayala.

Ayala does not argue, however, that the identity of the eyewitness should have been disclosed to preserve Ayala's right "to be confronted with the witnesses against him" (U.S. Const., amend. VI); nor that his arrest was illegal as having been made without probable cause. (See, *e.g., Roviaro v. United States* (1957), 353 U.S. 53, 1 L. Ed. 2d 639, 77 S. Ct. 623; *McCray v. Illinois* (1967), 386 U.S. 300, 18 L. Ed. 2d 62, 87 S. Ct. 1056.) Ayala contends only that the State's failure to call the witness should create an unfavorable presumption against the State. Our review of this issue, therefore, is limited accordingly.

■■ The instruction Ayala requested was not contained in the Illinois Pattern Jury Instructions, Criminal (2d ed. 1981) (hereinafter IPI Criminal 2d). When "IPI-Criminal does not contain an accurate instruction on a subject that the jury should be instructed upon and if the tendered non-IPI instruction is simple, brief, impartial, and free from argument," then the trial court abuses its discretion in refusing to give the instruction when "the *** refusal *** results in the jury not being instructed as to a defense theory of the case which is supported by some evidence." *People v. Wolfe* (1983), 114 Ill. App. 3d 841, 851-52.

Ayala advances the holding in *People v. Strong* (1961), 21 Ill. 2d 320, as support for his claim that the court abused its discretion. *Strong* held that the unexplained failure by the prosecution to call a witness who was the only person who could have rebutted defendant's testimony indicating that he had been entrapped by police "may give rise to an inference against the state." (21 Ill. 2d at 325.) Later cases, however, have limited the holding in *Strong* to cases involving the defense of entrapment. (See *People v. Poulos* (1990), 196 Ill. App. 3d 653, 661.) Further, there are cases which have held that such a wit-

ness must have testimony unique to the case in order to give rise to the negative inference.

In *People v. Williamson* (1966), 78 Ill. App. 2d 90, patrons at a bar who witnessed a shooting were not called by the State to testify, leaving only the testimony of the bartender against the defendant. The court first stated:

> "When a case turns upon a disputed issue of fact which an available witness could resolve from his unique knowledge of the event and the State chooses not to call that witness to testify, then the trier of fact may infer that the testimony would have been unfavorable to the State." (78 Ill. App. 2d at 96.)

The court then went on to note that the witnesses who did not testify "were in no better position to identify the defendant than was the bartender." (78 Ill. App. 2d at 97.) Moreover, the bartender's testimony was neither impeached nor discredited and no motive was suggested for the State to suppress evidence identifying the defendant. The court held that therefore the witnesses not called by the State did not have such unique knowledge of the event as to "demand an explanation for [their] *** absence." 78 Ill. App. 2d at 97. See also *People v. DeSavieu* (1973), 11 Ill. App. 3d 529, 534 (no negative presumption arises from State's failure to call as witnesses or satisfactorily explain the absence of eyewitnesses or of police officers in the area).

In *People v. Zenner* (1980), 84 Ill. App. 3d 566, 571, the court held:

> "The State is not required to produce every witness to a crime, nor does the failure to do so ordinarily create a presumption that the testimony of that witness would be unfavorable to the State."

In that case, the victim of an aggravated battery testified, but not the wife of the defendant, who was also an eyewitness. The accounts of the event given by the victim and by the defendant contradicted one another. The court's holding that the presumption was not required was based on both the lack of a requirement to produce every witness, and on the fact that the witness was available to the defendant. 84 Ill. App. 3d at 571-72.

In this case, although the witness was not made available to the defendant, the eyewitness testimony of Figueroa and Villasenor was unimpeached and uncontradicted by any other evidence. The unidentified eyewitness' role was to lead Sobczyk to review a set of photo books containing Ayala's picture. There is no claim that the resulting identifications by Figueroa and Villasenor were made under the influ-

ence of this unidentified witness or were otherwise improperly influenced by the police.

We hold, therefore, that the failure to provide the jury with the requested instruction was not an abuse of the court's discretion, since the witness did not have unique testimony to offer in the case.

Ayala's fifth claim is that the jury verdict finding him guilty of aggravated battery causing great bodily harm to Mercado was not adequately supported by the evidence. Ayala avers that the State failed to sufficiently prove that Mercado suffered "great bodily harm" as a result of the gunshot wound. The evidence at trial, according to Ayala, showed only that the bullet entered the rear of Mercado's thigh and passed through the front of his leg, and that Mercado spent only 30 minutes in the hospital after the shooting.

The State responds by arguing that the limited amount of time Mercado spent in the hospital does not affect the sufficiency of the evidence against Ayala, and the fact that the bullet entered one part of Mercado's leg and exited through another is sufficient evidence of great bodily harm.

When reviewing a claim of insufficient evidence, this court is required to determine

"whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People v. Young* (1989), 128 Ill. 2d 1, 49.)

(See also *People v. Penson* (1990), 197 Ill. App. 3d 941, 944.) In making such a determination, the court is mindful of the "function of the jury as the trier of fact to assess \*\*\* the inferences to be drawn from the evidence." 128 Ill. 2d at 51. See also *People v. Carr* (1989), 188 Ill. App. 3d 458.

We find the nature of Mercado's wound, as described at trial, sufficient to support the jury's verdict in this case. Courts have held irrelevant whether the victim sought medical attention at all after the incident. See, *e.g., People v. Olmos* (1978), 67 Ill. App. 3d 281, 289-90; *People v. Matthews* (1984), 126 Ill. App. 3d 710, 714-15.

Furthermore, jury verdicts finding great bodily harm have been upheld solely on the basis of the action the defendant took against the victim. In *People v. Cross* (1980), 84 Ill. App. 3d 868, 872, the court upheld such a verdict, even without proof of the nature and extent of the injury inflicted, when the evidence showed that the victim had been hit on the head with a lead pipe. In *People v. Matthews* (126 Ill. App. 3d at 714-15), a similar verdict was upheld when the victim suffered only a head bruise which resulted from the victim's having been

struck there with a gun. Accordingly, we decline to reverse the jury's verdict on this basis.

Ayala's sixth claim is that he was convicted and sentenced for two separate offenses, attempt (murder) and armed violence against Figueroa, despite the fact that both offenses arose from the same physical act. Ayala first shot Figueroa in the abdomen. When Figueroa began to flee, Ayala shot him again, this time in the arm. Ayala states that shooting Figueroa in the chest and in the leg was a single physical act which could not, since he had already been convicted and sentenced for attempt (murder), also be used to support a conviction and sentence for armed violence. Despite Ayala's failure to object to the conviction for armed violence at his trial, we treat this omission as plain error, since it resulted in a sentence of 30 years in the custody of the Illinois Department of Corrections, albeit to be served concurrently with the conviction for the attempted murder of Figueroa. We therefore review this issue.

The court in *People v. Johnson* (1989), 128 Ill. 2d 253, 288, reaffirmed the standard set by *People v. King* (1977), 66 Ill. 2d 551, 566, for determining whether more than one conviction can be obtained when interrelated acts, each of which could support a conviction, are committed:

> " 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold *** that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered."

The court in *Johnson* upheld armed violence and attempt (murder) convictions against a defendant who had fired a shot at the victim, shot another person twice, attempted to rob that second person and then shot the first victim again. The court based its determination that both convictions could stand on the ground that "there were two separate physical acts sufficient to support each conviction, the two gunshots, along with a number of events intervening between the two acts." (*Johnson*, 128 Ill. 2d at 289.) Although the court mentioned that events intervened between the two acts, it did not hold that the two gunshots were separate acts *because* events intervened between them.

The court in *Johnson* referred to *People v. Myers* (1981), 85 Ill. 2d 281, to support its decision. In *Myers*, the court upheld separate convictions and concurrent sentences for attempt (murder) and for armed violence predicated upon aggravated battery. The defendant wounded

the victim by cutting his throat with a knife, moved the knife away to threaten a third person, cutting that person's fingernail in the process, then put the knife to the victim's throat once more, cutting it still deeper. The court held that the two acts of cutting the victim's throat, even though in the same place and closely related in time, were sufficient to constitute separate physical acts. (85 Ill. 2d at 288-89.) In *Myers*, the court held that "[t]wo separate invasions of [the victim's] body, even though closely related by reason of the fact that they attacked the same area of his body and were close in time, were not one physical act." 85 Ill. 2d at 289.

This court, in *People v. Partee* (1987), 157 Ill. App. 3d 231, upheld three separate convictions for aggravated battery where the defendant, in the course of struggling for several minutes with the intended victim of a robbery, stabbed him three times. The court held that "[e]ach injury constituted an independent offense and was caused by a separate physical blow." The court distinguished its earlier decision in *People v. Baity* (1984), 125 Ill. App. 3d 50, where it had held that the defendant's act of shooting the victim three times constituted only a single act, on the ground that the shots were fired "in rapid succession." *Partee*, 157 Ill. App. 3d at 270.

Other cases have held that when a defendant commits even several acts against a victim during a single attack, and the attack is the basis for more than one charge, only one conviction and sentence can be obtained. See, *e.g., People v. Gvojic* (1987), 160 Ill. App. 3d 1065 (multiple stab wounds resulting from a single attack held to be the result of only one act).

In *People v. Young* (1989), 187 Ill. App. 3d 977, however, this court held that a defendant was properly convicted of both armed violence and of murder. In that case, the defendant was held to have committed two separate acts against the victim when he shot the victim in the face, fired shots at two of the victim's companions, then walked over to where the victim was crawling and shot him in the head. (187 Ill. App. 3d at 987.) The court held that the two shots fired at the victim

> "were distinct physical acts because, just as the two cuts to the victim's neck in *Myers* were separated by the cutting of another person's fingernail, the two shots in this case were separated by the intervening act of firing at [the victim's companions]." 187 Ill. App. 3d at 987.

Despite the implication of *Young* that an intervening act by the defendant is required in order to sufficiently separate two other acts so as to support conviction on two separate offenses, we do not read

the Illinois Supreme Court's decision in *Myers* or *Johnson* as requiring any such intervention. In the instant case, the second of the two gunshots fired by Ayala at Figueroa was fired after Figueroa had fallen down, had begun to flee, and had stopped to notice the crowd that had gathered at the scene. Accordingly, we hold that on these facts the two gunshots sufficiently constitute separate and distinct "overt or outward manifestation[s]" (*People v. King* (1977), 66 Ill. 2d 551, 566), so as to support two separate offenses, despite the close relationship in time between the two shots. Accordingly, we affirm Ayala's conviction for armed violence against Figueroa.

 Ayala's seventh claim is that his firing of a single shot at Villasenor, which wounded him, was a single physical act, thus precluding him from being convicted both for attempt (murder) and for armed violence as to that victim. Ayala seeks vacation of his conviction and sentence for armed violence. Since the State agrees with this claim, the conviction and sentence are accordingly vacated.

 Ayala's eighth claim is that he could not properly be convicted both for attempt (murder) and for aggravated battery against Figueroa and against Villasenor, as aggravated battery is a lesser included offense of attempt (murder). Inasmuch as the State agrees with this claim, the convictions and sentences for aggravated battery against Figueroa and against Villasenor are accordingly vacated.

 Ayala's ninth claim is that his mittimus incorrectly states that he was convicted of three charges of attempt (murder) and that it should be amended to reflect his conviction on only two counts. The State agrees with this claim as well; accordingly, this cause is remanded to the circuit court with directions that a corrected mittimus be issued to reflect Ayala's conviction on only two charges of attempt (murder).

Affirmed in part; vacated in part; cause remanded with directions.

HARTMAN and BILANDIC,* JJ., concur.

---

*Judge Bilandic participated in the decision of this case prior to taking office as a supreme court judge.