THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MELVIN CLIFTON, Defendant-Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VINCENT GALLOWAY, Defendant-Appellant.

First District (2nd Division)   Nos. 1—98—2126, 1—98—2384 cons.

Opinion filed September 29, 2000.—Supplemental opinion filed April 24, 2001.

708

Michael J. Pelletier and Donna Finch, both of State Appellate Defender's Office, of Chicago, for appellants.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Margaret J. Campos, and Christina C. Frenzel, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

In these two consolidated cases, codefendants Melvin Clifton and Vincent Galloway appeal from the contemporaneous respective judgments of the trial court convicting them each of first degree murder, attempted first degree murder and aggravated battery with a firearm. Galloway argues on appeal that portions of the gang-related testimony presented at trial were hearsay; both he and Clifton argue that such testimony was irrelevant and prejudicial and was offered solely to inflame the jury. Clifton argues that because the name of one of the witnesses providing that testimony was submitted on the eve of trial, the State thereby committed a discovery violation. Clifton also argues that he was not tried within 120 days as required by the speedy trial statute (725 ILCS 5/103—5 (West 1998)), and therefore his counsel's failure to move for dismissal for lack of a speedy trial denied him effective assistance of counsel. Finally, Clifton argues that there was insufficient evidence to prove him guilty beyond a reasonable doubt either as a principal or on an accountability theory. For the reasons set forth below, we affirm the judgment of the trial court as to each defendant.

## BACKGROUND

Following simultaneous but severed jury trials, Galloway and Clifton were found guilty of the first degree murder of Leon Holton (also known as Milkman) and of attempted first degree murder and

aggravated battery with a firearm in the shooting of Eddie Brown. Galloway was sentenced to prison terms of 80 years for first degree murder and 40 years for attempted first degree murder, to be served consecutively. Clifton received sentences of 55 years for first degree murder and 25 years for attempted first degree murder, also to be served consecutively.

Prior to trial, defendants, who were members of the Gangster Disciples street gang, moved *in limine* to bar the State from introducing evidence of their gang affiliation on the ground that it would be more prejudicial than probative. The State had sought to introduce testimony by Tom Richardson, a Chicago police department gang crimes specialist, to help establish what the State asserted was the gang-related motive for the crime. According to the State, because of an alleged leadership vacuum in the Gangster Disciples resulting from the federal indictment of 39 gang members on August 31, 1995, there was jockeying among remaining gang members for leadership positions. As a result, a gang leader named Chuck Dorsey was killed in January 1996, and Holton was suspected of having killed him. The State's theory was that Gangster Disciples leader Larry Hoover was angry that Dorsey had been killed, and Galloway and Clifton, who held subordinate leadership positions in the gang, killed Holton in retaliation.

On February 5, 1998, the court heard argument and granted defendants' motion *in limine*, stating that there would be no mention of gang affiliation. On February 19, the date that jury selection was scheduled to begin, the State submitted a motion to allow gang-related evidence as motive, including the testimony of gang crimes specialist Richardson and of Philander Jenkins, a cooperating witness in a concurrent federal investigation of the Gangster Disciples. The State also filed a supplemental answer to discovery adding Jenkins' name to its list of potential witnesses. The case was continued on that date and on subsequent dates thereafter, with jury selection ultimately commencing on March 10, 1998. Jenkins testified at a pretrial hearing on March 3, 1998, and on March 6, the trial court granted the State's motion as to Jenkins, concluding that his testimony was sufficiently relevant to be presented to the jury and that there was no discovery violation even though Jenkins was not listed as a potential witness until February 19. The court subsequently stated on March 11 that Richardson could testify as to the leadership structure of the Gangster Disciples and as to which of its leaders were in federal custody, but he could not state the reason for the shootings.

The following evidence was adduced at trial. Eddie Brown testified for the State that on March 10, 1996, he and the murder victim, Leon

Holton, were driving around in Brown's car when Holton called some-one on his cell phone and then said he had to go and meet someone. Brown drove Holton to 78th Street, where Holton saw a maroon Olds-mobile with the person he was to meet inside. Brown honked at the car, and the two cars pulled to the side of the road, with Brown's car behind the Oldsmobile. Brown said the two men in the Olds got out of their car and approached his car. He identified (in court) the man who got out on the passenger side as Galloway, whom he knew at the time as Legs Diamond, a member of the Gangster Disciples. The man who got out on the driver's side was hopping on a crutch and had a cast on his leg. Brown said that man entered Brown's car and sat behind Brown in the backseat, and Galloway entered and sat in the backseat on the passenger side behind Holton. Galloway told Brown the other man's name was Melvin, and Brown identified him in court as Clifton. Brown said once the two men were in the car, he and Galloway talked about the Chicago Bulls basketball game that day. Holton then asked Clifton what was up, and Clifton said he had paged someone and was waiting for a call back on his cell phone.

Brown testified further that, as he was about to turn around and say something, he noticed out of the corner of his right eye what looked like a silver tube extension behind him and then heard a "poof sound," like a gun with a silencer, and felt a pain in his neck and knew he had been shot. Brown then grabbed the door handle, and as he was trying to get out of the car he felt a sharp pain in his right hip and another in his back on the right side. Brown got out of the car and tried to run but fell because he had been shot in the hip. As he was lying in front of his car, Brown said he saw Galloway get out of the car on the passenger side, walk toward him and stand directly over him, pointing a gun at his head. Galloway then and there shot Brown in the forehead and the upper right chest and thereupon turned to Clifton, who had exited the car and was standing nearby, and told him he was out of bullets. Galloway and Clifton then ran to the maroon Olds, with Clifton hopping on his crutch, and the car took off.

Brown stated that he next called his sister on his cell phone, and his niece, Asunta Saddler, answered. Brown told her who had shot him and where he was, and subsequently the police and an ambulance ar-rived. Brown talked to a police officer while he was in the ambulance and told him who shot him. Brown was then taken to a hospital.

The next afternoon, March 11, 1996, Brown said he talked to two detectives, a male and a female, while he was in the hospital. They showed him four or five photos, from which he identified Galloway. About two weeks later, on April 4, 1996, Brown went to the police sta-tion and viewed a series of photos from which he identified Clifton,

whom he also identified in court. On May 1, 1996, Brown went back to the police station and viewed a lineup from which he identified Galloway. Three days later he viewed another lineup and identified Clifton.

On cross-examination by Clifton's counsel, Brown conceded that he had not seen Clifton with a gun. Brown also said he learned when he was in the hospital that Holton had been shot but that he did not know which of them was shot first. According to Brown, when he talked to his niece on his cell phone after the shooting he told her that Galloway had shot him, but he conceded that he did not remember "saying another guy." On March 12, 1996, two days after the shooting, Brown spoke in the hospital to an assistant State's Attorney (ASA) and a Chicago homicide detective and gave them an eight-page statement. Brown told them it was Galloway who shot him, but he admitted in his testimony that although he told the ASA there was a second person, he did not remember telling them the second person's name was Melvin. The parties stipulated that in Brown's eight-page statement he did not mention the name Mel or Melvin as being the second person who was with Galloway.

On redirect, Brown stated that the first time he met Clifton was on March 10, 1996, and that if he did not mention Clifton's name when he talked to the ASA and the police detective two days later, it was probably because he had forgotten it. Brown also testified that on April 4, 1996, after he identified Clifton's photo in a photo array, he asked the police detective what the person's name was and the detective told him. Brown then told the detective that he remembered that the person who was with Galloway was named Melvin. In addition, Brown said he told a grand jury on April 12, 1996, that when he talked to his niece on the night of the shooting, he told her that "Legs Diamond and Melvin" shot him.

Brown's niece, Asunta Saddler, testified for the State that Brown called her at about 8:45 p.m. on March 10, 1996, saying he had been shot and needed help. She asked him who had done it, and he told her "Melvin and Legs Diamond." On cross-examination by Clifton's counsel, Saddler said that is what she told the police when she subsequently spoke to them on the telephone: that "Legs Diamond and Melvin" had done this.

The State's next witness, Chicago police sergeant James Jackson, testified that when he arrived at the scene of the shooting on the night of March 10, 1996, he went to the ambulance and talked to Brown, who told him that Legs Diamond had shot him and that there was another person with him but he did not know his name. Jackson also said he saw a black male with a fatal gunshot wound at the back of his head seated in the front passenger seat of a car parked on the

south side of the street. Jackson later learned that the man was Holton. On cross-examination by Clifton's counsel, Jackson conceded that during the conversation in the ambulance Brown told him that Galloway "pulled a handgun" and shot Holton in the head, and that Galloway shot Brown several times when he tried to flee from the car.

Chicago police detective Linda Drozdek stated that she and her partner, Detective George Carl, went to Christ Hospital the night of March 10, 1996, to check on Brown's condition. While they were there, hospital personnel gave Detective Carl a bullet that had been recovered from Brown's clothes. The next day (March 11), Drozdek and Carl went back to the hospital and showed Brown a series of five photographs from which he identified Galloway as Legs Diamond. Brown told them that (unlike the photo) Galloway at present had no hair.

Delilah Hunt next testified for the State. She stated that in March 1996 Holton was her boyfriend. She testified that on the morning of March 10, she and Holton drove to a restaurant and parked next to a car in which Galloway was sitting in the driver's seat. She said Holton got out of their car and got into the front seat of Galloway's car, and the two men talked for 10 to 15 minutes. Hunt said she and Holton then returned to their house, and at some point later he left. Hunt subsequently learned what had happened to Holton. The next morning, March 11, she met with Chicago police detective John Hamilton, who showed her a series of photographs from which she identified Galloway. Hunt said she noticed that (unlike the photo) Galloway was "bald headed" when she had seen him (the day before) in the restaurant parking lot. About four days after the shooting, Hunt saw Galloway and Clifton sitting together in a car. She said that as she rode past, Clifton looked up and pointed at her, but she kept going and went home. About three hours later, Galloway came to her house and asked if Holton or Holton's son, Del, lived there, to which she answered "no." A week or so later, Clifton came to Hunt's house and asked her if someone new had moved onto the block. About three days after that, Galloway returned to Hunt's house and also asked if someone new had moved onto the block. Hunt said that, because she was "scared," she called the detectives who were in charge of the case "sometime after that." On April 12, 1996, while testifying before a grand jury, Hunt viewed a series of photos and identified Clifton.

The State also called Philander Jenkins, who testified that he had been a member of the Gangster Disciples. Jenkins stated that he was arrested by federal authorities on November 6, 1997, after having sold $4,500 worth of cocaine to a federal informant. Because he was facing a possible penalty of up to life in prison without possibility of parole, Jenkins said he began cooperating with federal authorities. Jenkins

also stated that the first time he said anything about the instant case was in mid-February 1998 when he talked to ASA Brian Sexton about it. According to Jenkins, though he spoke to federal authorities several times following his arrest in November 1997, they did not ask him about this case.

Jenkins testified further that he was a Gangster Disciple on August 31, 1995, when 39 members of the gang were indicted in federal court. (Neither Jenkins nor any of the principals in this case was among those indicted.) Jenkins named 3 of the 39 who he said were board members, which is the rank just below Larry Hoover, the head of the Gangster Disciples. In addition, Jenkins named another of the 39 who he said was a governor, which is the next rank below a board member. Following the August 31 indictments, Jenkins became a regent, which is below a governor. Jenkins identified Clifton in court and said Clifton was his governor.

Jenkins also averred that around September 1995, a man named Chuck was running the Gangster Disciples for the entire city. In January 1996, Chuck was murdered, and Jenkins said he subsequently learned that there had been friction between Chuck and Holton, who held the rank of board member. According to Jenkins, Holton "felt that he should have had the city and not Chuck."

About two months later, in March 1996, Jenkins saw Clifton with a man he subsequently learned was Galloway. A couple of days after that, about four days before Holton's murder, Jenkins attended a Gangster Disciples meeting which he said was called to reassure the members that, despite the previous indictments, "the gang was still going strong." Both Clifton and Galloway were at the meeting. Galloway introduced himself as a (Gangster Disciples) board member, and Clifton, who Jenkins said had a cast and was using crutches, introduced himself as a governor. According to Jenkins, at one point Clifton asked those present if they would kill a board member or governor if they were required to, and they answered yes.

A couple of days later (about two days before Holton's murder), Jenkins said he met with Clifton in response to a page from a gang member named Onion, and Clifton told Jenkins he was "having a problem" and "needed a couple of units," meaning guns. Jenkins obtained a .380 automatic and a Tech 9 and gave them to Clifton. About two weeks after Holton's murder, Jenkins said he gave $500 to a board member named "Godfather" and gave as his reason: "so Melvin [Clifton] could leave town."

Prior to cross-examination by Clifton's counsel, the parties stipulated that Jenkins was debriefed by federal law enforcement officials five times between November 6, 1997, and February 9, 1998. On cross-

examination, Jenkins reasserted that, during those debriefings, he never told federal authorities that he had any information about Holton's murder. On redirect, Jenkins stated that no one ever identified for him the kind of weapon that was used in Holton's murder.

The State also called Dr. Thamrong Chira, a Cook County medical examiner who performed an autopsy on Holton on March 11, 1996. Dr. Chira testified that Holton had a single gunshot wound entering at the back of his neck on the left side. There was no evidence of close-range firing, which meant that the muzzle of the gun had to be more than 18 inches from the entry wound. Dr. Chira also said the bullet traveled from left to right and from back to front and was found on the right side of Holton's neck. Given those two factors, Dr. Chira said it was more likely that the shooter was in the backseat behind the driver (Clifton's position) rather than on the passenger side. On cross-examination by Clifton's counsel, Dr. Chira conceded that if the person on the passenger side had leaned forward and shot the driver first and then turned and shot Holton on an angle from where the driver was located, it was possible that Holton could have been shot by someone in the rear passenger seat. Dr. Chira said the shot had to have come from a little to the left and behind the victim.

The parties stipulated that if Robert Smith, a Chicago police department firearms examiner, were called, he would testify that in his opinion the fired bullet recovered from Christ Hospital (from Brown's clothes) had the same class characteristics as having been fired from a .380 automatic pistol. Smith would testify that in his opinion the same was true of a fired bullet recovered from Holton's body, and of five cartridge casings recovered from the scene of the shootings.

The State next called Thomas Richardson, a detective in the Chicago police department's gang crimes unit who also was detailed to an ongoing federal investigation of the Gangster Disciples. Richardson's testimony corroborated that of Philander Jenkins as to the gang's leadership hierarchy and the August 31, 1995, federal indictments of 39 Gangster Disciples. Richardson also stated that Holton, the murder victim, had been a board member for two to three years prior to the August 31 indictments and that he was elevated to that position because he was "a very prosperous narcotics dealer on the South Side" and had "a lot of money" and "a lot of power." According to Richardson, after the 39 were indicted, Chuck Dorsey "was given the OK" by Gangster Disciples leader Larry Hoover to take control of the city for the gang. On January 4, 1996, Dorsey was shot and killed.

The State's next witness, Chicago police detective John Hamilton, testified that on April 26, 1996, the Federal Bureau of Investigation

(FBI) notified him that Clifton had been taken into custody in Fort Wayne, Indiana. Hamilton and his partner, Detective Timothy Bagdon, went to Fort Wayne and talked to Clifton that evening in an office in the Allen County jail. Upon being asked if he knew where Galloway was, Clifton said he had not seen Galloway since "that date," which he explained was the day Holton was killed.

Galloway was arrested in Chicago on April 30, 1996, and Hamilton said he and Bagdon spoke with him that day. After being advised of his rights, Galloway told them he was a board member with the Gangster Disciples and that he had known Clifton for several years and they were friends. Galloway also said he knew Holton (the murder victim) but that he and Holton were "not close." According to Galloway, Holton had not earned his way up through the ranks as others in the gang had but instead was given his position as board member "because of his money." Galloway said Holton was not well liked for that reason and "because he threw his weight around." Galloway also denied any knowledge of or involvement in Holton's murder.

Hamilton testified further that he and Bagdon returned to Fort Wayne, Indiana, on May 3, 1996, to bring Clifton back to Cook County. During the drive back to Chicago, Clifton asked Hamilton what was up with his case, and Bagdon advised Clifton of his rights. Hamilton said Clifton then had a conversation with them, stating that he was a governor in the Gangster Disciples and that he knew Galloway and had known him for several years. Clifton also said he knew Holton and knew that he was a board member in the gang. Clifton also denied any knowledge of or participation in Holton's murder.

On cross-examination by Clifton's counsel, Hamilton conceded that when he showed Eddie Brown a photo array that included Clifton's photo, Brown never told him that he saw Clifton with a gun.

The juries found each defendant guilty of the first degree murder of Holton and of attempted first degree murder and aggravated battery with a firearm in the shooting of Brown. As noted previously, Galloway was sentenced to a total of 120 years in prison, and Clifton received sentences totaling 80 years. These two consolidated appeals followed.

## ANALYSIS

### Hearsay

Galloway argues on appeal that portions of the testimony given by Philander Jenkins and Detective Thomas Richardson were hearsay and that the trial court abused its discretion by admitting that testimony. We agree in part with Galloway that portions of the testimony to which he objected were hearsay, but we conclude that, as to those portions, any error in admitting them was harmless.

## A. Philander Jenkins' Testimony

■ According to Galloway, the following portions of testimony given by Jenkins over objection constituted inadmissible hearsay: (1) that after Chuck Dorsey's murder, Jenkins learned from talking to other Gangster Disciples that there had been tension between Holton and Dorsey and that Holton felt he should have been running the gang's Chicago operation instead of Dorsey; (2) that during a Gangster Disciples meeting that Jenkins attended shortly before the shootings, Clifton asked those present if they would kill a board member or governor; and (3) that Clifton told Jenkins two days before the shootings that he needed "units," meaning guns.

The first of the foregoing statements is clearly based on inadmissible hearsay. Jenkins testified that he did not know Holton personally and that he learned of the conflict between Holton and Dorsey from talking to other gang members. Thus Jenkins described a conflict of which he had no personal knowledge and about which he learned from others who were not subject to cross-examination at trial. This meets the definition of rank hearsay. See *People v. Rogers*, 81 Ill. 2d 571, 577, 411 N.E.2d 223, 226 (1980) (hearsay defined as "testimony of an out-of-court statement offered to establish the truth of the matter asserted therein, and resting for its value upon the credibility of the out-of-court asserter"). The mere fact that the sources of his information refer to more than one person does not change the character of this testimony as rank hearsay. *Cf. Galindo v. Riddell, Inc.*, 107 Ill. App. 3d 139, 145, 437 N.E.2d 376, 381 (1982) (testimony about results of survey held to be inadmissible hearsay where survey not shown to have used methods generally accepted in scientific community to produce statistically accurate results). Furthermore, there can be no question that the statement was offered for the truth of the matter asserted: namely, that Holton was in a power conflict with Dorsey as a basis upon which Clifton and Galloway presumed Holton to be Dorsey's killer. See *Rogers*, 81 Ill. 2d at 577, 411 N.E.2d at 226. As the trial court noted in a conference out of the presence of the juries, that testimony was "classic hearsay."

The second of the foregoing statements, namely, Clifton's question about killing a board member or a governor, is also inadmissible hearsay with respect to Galloway. The State argues that the question is admissible because it was offered not for the truth of the matter asserted but "for the purpose of showing that defendant Galloway was on notice and had knowledge of certain events that took place before the crime." See *People v. Sanchez*, 189 Ill. App. 3d 1011, 1016, 546 N.E.2d 268, 271 (1989). We disagree. If the question were offered to show that Galloway was hatching a plot or attempting to recruit gang

members to participate in the killing of a gang official, it clearly would be inadmissible in that it was being offered for the truth of its content. If on the other hand it is offered, as the State contends, to show that Galloway was put on notice that some sort of recruitment was being mounted, such notice on Galloway's part is insufficiently relevant even as part of the chain of evidence necessary to establish Galloway's culpability. Since it was established by direct testimonial evidence at trial that Galloway was present when the crime took place and that he shot Eddie Brown, the only question as to Galloway upon which there was merely circumstantial evidence was whether it was Galloway or Clifton who shot Holton. Thus the only apparent purpose as to Galloway for the State to offer Clifton's question would be toward establishing the accountability of Galloway for Holton's murder even if the actual shooting were done by Clifton. As shall be discussed later, accountability can be shown by a number of factors, including the defendant's presence during the planning of the crime. See *People v. Walker*, 230 Ill. App. 3d 377, 388, 594 N.E.2d 1252, 1259 (1992). However, establishing that Galloway had notice of Clifton's possible recruitment of fellow gang members to kill a gang official is too remote to help establish Galloway's involvement in that killing, even in conjunction with other evidence. See *People v. Floyd*, 117 Ill. App. 3d 168, 173, 453 N.E.2d 30, 33 (1983) (state-of-mind exception to hearsay rule applies only where declarant's state of mind is relevant to a material issue in the case).

The third statement, Clifton's telling Jenkins that he needed guns, is on its face rank hearsay being introduced for the truth of its content. The State presents no argument to suggest that this statement is admissible under any exception to the hearsay rule or that it can be viewed as a verbal act. We do not mean to imply, however, that Jenkins' testimony that he gave two guns to Clifton was hearsay. That statement was clearly based on Jenkins' personal knowledge, and no statement by an out-of-court declarant was involved.

### B. Detective Richardson's Testimony

According to Galloway, the following testimony by Detective Richardson was hearsay: (1) that Galloway was a board member in the Gangster Disciples in late 1995 or early 1996; (2) testimony as to the internal organization of the Gangster Disciples: that Larry Hoover was the leader, and that below him, in rank order, were the board members, governors, regents, coordinators, and soldiers; (3) that 39 members of the Gangster Disciples were indicted on August 31, 1995, including some board members and governors; (4) that the murder victim, Holton, was a board member, a position he held for two or

three years prior to August 31, 1995, and that he became a board member because he was a "very prosperous narcotics dealer on the South Side" and thus had "a lot of money" and "a lot of power"; and (5) that after the 39 were indicted in August 1995, Hoover gave "the OK" for Chuck Dorsey to take control of the city of Chicago for the gang and that Dorsey was murdered on January 4, 1996.

■ Police testimony regarding gang activity is admissible if (1) it qualifies as expert opinion, (2) it is relevant, and (3) its prejudicial effect does not outweigh its probative value. *People v. Cruzado*, 299 Ill. App. 3d 131, 141, 700 N.E.2d 707, 714-15 (1998); *People v. Davenport*, 301 Ill. App. 3d 143, 150, 702 N.E.2d 335, 341 (1998). Regarding the first prong of this test, a witness qualifies as an expert if, "because of his skill, training, or experience, he is better able to form a more accurate opinion as to the matter under consideration than is an ordinary person." *People v. Ayala*, 208 Ill. App. 3d 586, 593, 567 N.E.2d 450, 455 (1990). Specialized formal training is unnecessary, and experience alone can qualify a witness as an expert. *Ayala*, 208 Ill. App. 3d at 593, 567 N.E.2d at 455. So long as the testimony is based upon information "of a type reasonably relied upon by experts in the field," it is proper "even though the information may not be admissible in evidence." *People v. Jackson*, 145 Ill. App. 3d 626, 634, 495 N.E.2d 1207, 1214 (1986).

■ Detective Richardson clearly qualifies as an expert. He testified at trial that he had been a Chicago police officer for 27 years and a gang specialist for 18. His main function as a gang specialist was to monitor and obtain information about street gangs, including the Gangster Disciples. Further, since 1992 he had been detailed to an investigation with federal authorities into the Gangster Disciples. See *Ayala*, 208 Ill. App. 3d at 590, 593-94, 567 N.E.2d at 453, 455 (holding qualified as expert a gang crimes specialist with two years' experience in neighborhood where crime occurred); *Jackson*, 145 Ill. App. 3d at 634, 495 N.E.2d at 1214 (gang specialist with five years' experience in investigation of gangs in the area held qualified as expert).

■ However, it still must be determined whether the testimony that Richardson gave at trial qualified as expert opinion. For purposes of our analysis, Richardson's testimony can be divided roughly into two categories: (1) that dealing with the internal hierarchy and structure of the Gangster Disciples, and (2) testimony dealing with more specific matters such as that Holton acquired his board-member position because of his money and power, or that Chuck Dorsey "was given the OK by Larry Hoover" to take control of the city for the gang. As to the first category, there is little question that it qualifies as expert opinion. In *People v. Cruzado*, 299 Ill. App. 3d 131, 700 N.E.2d

707 (1998), a gang crimes specialist's testimony as to matters such as gang structure was held to qualify as expert opinion where there was "no showing that the average layperson has any understanding of the inner workings of gangs *** or of the jury's common knowledge of them." *Cruzado*, 299 Ill. App. 3d at 141, 700 N.E.2d at 715. There was no such showing in the instant case. See also *People v. Davenport*, 301 Ill. App. 3d 143, 150, 702 N.E.2d 335, 341 (1998) (holding that it was reasonable to conclude that "layperson does not have the same opportunity to observe and learn about the detailed hierarchy and activities of street gangs as did [gang specialist who testified]").

Richardson's more detailed testimony also qualifies as expert opinion. Similar testimony has been held by other courts to be admissible. In *Jackson*, for example, a gang specialist not only explained the "organizational structure of the 'Black Disciples' around 4410 South State [in Chicago]," he also "identified Ricky Knight as the leader of the unit at 4410 South State, defendant as second in command, and Fields, known as 'Stokes' or 'Boo Boo,' as the number three man in the unit." *Jackson*, 145 Ill. App. 3d at 630-31, 495 N.E.2d at 1212. That testimony was held admissible, with the court emphasizing that it was based "on many different sources, including personal observation and gang infiltration, and [the gang specialist's] testimony that he verified and investigated information learned from others." *Jackson*, 145 Ill. App. 3d at 634, 495 N.E.2d at 1214; *cf. People v. Washington*, 127 Ill. App. 3d 365, 386-87, 468 N.E.2d 1285, 1300-01 (1984) (investigator's testimony regarding defendant's gang membership held inadmissible where based solely on information from one unnamed informant). The court in *Jackson* concluded that the gang specialist's testimony "appear[ed] to be based on facts or data reasonably relied upon by experts in the field of street gangs" (*Jackson*, 145 Ill. App. 3d at 634, 495 N.E.2d at 1214), explaining:

> "As a matter of practicality, the method of information gathering used by [the gang specialist] is probably the only way a nongang member can accumulate details of gang activity and membership rank. Furthermore, [the gang specialist's] testimony is based on more data than are available to an average layperson." *Jackson*, 145 Ill. App. 3d at 634, 495 N.E.2d at 1214-15.

Thus the *Jackson* court stressed the pragmatic necessity for accessing a number of different sources, as well as the gang specialist's superior capability (compared to that of the layperson) in accessing those sources.

Similarly, in *People v. Mendez*, 221 Ill. App. 3d 868, 871, 582 N.E.2d 1265, 1267 (1991), a Chicago police gang crimes specialist testified that two rival gangs existed in the area where a shooting took place

and that the petitioner was a member of one of them. The court held that the testimony was properly admitted. *Mendez*, 221 Ill. App. 3d at 874, 582 N.E.2d at 1270.

Likewise, the California decision in *People v. Gamez*, 235 Cal. App. 3d 957, 286 Cal. Rptr. 894 (1991), is instructive. In that case, which involved a drive-by shooting arising from a dispute between the rival Southside and Highland Street gangs, one gang expert "opined [that] the shooting was a 'pay-back' for a prior shooting by Highland Street against Southside." *Gamez*, 235 Cal. App. 3d at 964, 286 Cal. Rptr. at 896. Another expert "opined [that] defendant was a member of Southside." *Gamez*, 235 Cal. App. 3d at 964, 286 Cal. Rptr. at 896. The defendant argued that such testimony was nothing more than hearsay, but the court disagreed, explaining:

> "We fail to see how the officers could proffer an opinion about gangs, and in particular about gangs in the area, without reference to conversations with gang members. *** To know about the gangs involved, the officers had to speak with members and their rivals. Furthermore, the officers did not simply regurgitate that which they had been told. Rather, they combined what they had been told with other information, including their observations, in establishing a foundation for their opinions." *Gamez*, 235 Cal. App. 3d at 968, 286 Cal. Rptr. at 899-900.

The method described by the *Gamez* court is essentially the same as the one approved in *Jackson*: talking to gang members and their rivals and combining that information with information from other sources in arriving at the expert's testimony. See generally Note, *The Limitations of Daubert & its Misapplication to Quasi-Scientific Experts*, 35 Washburn L.J. 134, 140-47 (1995) (discussing the inappropriateness of applying the *Daubert* factors to nonscientific testimony such as that of a police gang crimes expert).

In the instant case, Richardson's testimony also was drawn from a variety of sources. Early in his testimony, he described the various ways in which he was able to monitor the Gangster Disciples:

> "The best way is to get out on the street and you get in with the gang, the gang members. You talk to them. You talk to rival gang members. We go to different penitentiaries. You talk to members that are incarcerated. We work with C/Is, that's confidential informants, concerned citizens. We deal with the Board of Education, the CAPS program. We deal with outside agencies. Like I said before, the federal government, DEA, FBI, Secret Service, Immigration. We deal with all the suburban police departments. I have contacts in New York, L[os] A[ngeles], Florida, and Texas. We keep in contact with all the gang agencies throughout the United States."

Unlike the investigator in *Washington*, Richardson drew on a variety of sources, including conversations on the street with Gangster Disciples and rival gang members, talks with incarcerated gang members, information gleaned from confidential informants, and contacts with outside agencies such as the FBI and suburban police departments. Because of his role as a gang crimes specialist, he was able to access those sources using a method which, as the *Jackson* court noted, "is probably the only way a nongang member can accumulate details of gang activity and membership rank." *Jackson*, 145 Ill. App. 3d at 634, 495 N.E.2d at 1215. Accordingly, consistent with established precedent, we believe that Richardson's evidence qualified as expert testimony.

■ As to the second prong of the admissibility test, Richardson's testimony is relevant to the State's gang-related motive. "Relevant evidence is that which has any tendency to make the existence of a fact of consequence to the determination of the action more or less probable than it would be without the evidence." *Davenport*, 301 Ill. App. 3d at 150-51, 702 N.E.2d at 341-42. Further, though courts acknowledge that there may be strong prejudice against street gangs, particularly in metropolitan areas, it is nevertheless well established that "[g]ang-related evidence is admissible to show common purpose or design or to provide a motive for an otherwise inexplicable act." *Davenport*, 301 Ill. App. 3d at 151, 702 N.E.2d at 342; *Cruzado*, 299 Ill. App. 3d at 142, 700 N.E.2d at 715. "However, such evidence must relate to the crime charged." *Davenport*, 301 Ill. App. 3d at 151, 702 N.E.2d at 342.

Here, as noted, Richardson's testimony is relevant to the State's gang-related motive, and it is thereby related to the crime charged. His testimony about the indictment of the 39 Gangster Disciples (including some high-ranking members) helped support the State's claim that there was a leadership vacuum in the gang. Richardson also testified that Hoover had named Dorsey to his citywide leadership post and that Dorsey was subsequently killed, that Holton attained his board member position primarily because of his money and power (and, by implication, not because of merit), and that Galloway and Clifton held leadership positions in the gang below Hoover. If Hoover named Dorsey to his post, it is not unlikely that he would be angry that Dorsey was killed, nor is it unlikely that Galloway and Clifton, as gang leaders below Hoover, might be motivated to kill Holton in retaliation. Thus Richardson's testimony tended to show that defendants had a motive for killing Holton and shooting Brown, and his testimony thus is relevant because it rendered it more likely that they did commit those crimes. See *People v. Smith*, 141 Ill. 2d 40, 56, 565 N.E.2d

900, 906 (1990). The same reasoning applies to the testimony of Jenkins, which also was clearly relevant.

■ It is also manifestly apparent that Richardson's testimony is more probative than prejudicial, thus satisfying the third prong of the test. As noted, gang-related evidence, even though it might be prejudicial, is admissible "to provide a motive for an otherwise inexplicable act." *Davenport*, 301 Ill. App. 3d at 151, 702 N.E.2d at 342. Here, were it not for the gang-related evidence, the killing of Holton and the shooting of Brown would be inexplicable. According to the competent evidence presented at trial, the shootings occurred shortly after Galloway and Clifton entered Brown's car. Sitting in the backseat, Galloway talked briefly with Brown, the driver, about the Chicago Bulls game earlier that day. Then, in response to a question from Holton, Clifton said he was waiting for a call on his cell phone. Shortly thereafter, Holton was killed and Brown was shot five times and apparently left for dead. There was no evidence suggesting that this was a drug deal gone sour or indeed suggesting any other motive at all for the shootings. Richardson's gang-related evidence helped establish a motive for these otherwise inexplicable acts and therefore was not more prejudicial than probative. See *Cruzado*, 299 Ill. App. 3d at 142, 700 N.E.2d at 715; *Davenport*, 301 Ill. App. 3d at 151, 702 N.E.2d at 342. The same is true of Jenkins' testimony, and we therefore reject the argument that it was more prejudicial than probative, and offered solely to inflame the jury.

Even if Richardson's testimony were inadmissible hearsay, it would not necessitate reversal. As previously noted, any error in admitting hearsay testimony was harmless in view of the overwhelming, non-hearsay evidence against Galloway. See *People v. Grant*, 69 Ill. App. 3d 940, 944, 387 N.E.2d 1087, 1091 (1979) (trial error deemed harmless where evidence supporting defendant's conviction is so overwhelming that the conviction would result even if the error was eliminated); *Davenport*, 301 Ill. App. 3d at 153, 702 N.E.2d at 343 (error deemed harmless where court is satisfied beyond reasonable doubt that it did not contribute to defendant's conviction).

Here, Eddie Brown, the surviving victim, identified Galloway as the man who shot him five times, three of them while Brown was still in the car where Holton was killed. Brown also identified Clifton as the man accompanying Galloway. Thus Galloway was placed by competent testimony with Clifton in the car where (and when) the murder and attempted murder took place, and holding (and firing) a gun of the same caliber as one of the guns that Philander Jenkins testified he gave Clifton a couple of days earlier. As to the gang-related testimony of Jenkins and Richardson, Galloway himself admitted to

Detective Hamilton that he was a board member in the Gangster Disciples; that he had known Clifton for several years; and that he knew Holton, who Galloway said had gotten his position as a board member because of his money instead of earning his way up through the ranks. Hence, even if any error in admitting hearsay testimony were eliminated, the evidence remaining against Galloway would still have been overwhelming. Thus Galloway suffered no manifest prejudice (see *People v. Lucas*, 151 Ill. 2d 461, 489, 603 N.E.2d 460, 473 (1992)), and it would be reasonable to conclude that any error in admitting hearsay would not have contributed to his conviction (see *Davenport*, 301 Ill. App. 3d at 153, 702 N.E.2d at 343).[1]

Finally, while this cause was pending on appeal, the United States Supreme Court issued its decision in the case of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). In a supplemental brief, Clifton contends[2] that *Apprendi* renders section 5—8—4(a) of the Unified Code of Corrections (730 ILCS 5/5—8—4(a) (West 1996)) unconstitutional because that section imposes consecutive sentences if, *inter alia*, the court makes a factual finding that severe bodily injury occurred during the commission of the crimes in question. Clifton argues that pursuant to *Apprendi* such a factual determination must be made by a jury and not by the court. Since he was sentenced to consecutive sentences pursuant to this provision, Clifton contends that his sentences must be changed to run concurrently. Also in a supplemental brief, the State contends that Clifton has waived this issue on appeal and that *Apprendi* does not apply to the consecutive sentencing statute.

■ We will first address the State's waiver argument. The State contends that Clifton has waived consideration of this matter on appeal by failing to raise it in a timely postsentencing motion, based on our supreme court's decision in *People v. Reed*, 177 Ill. 2d 389, 686 N.E.2d 584 (1997) (sentencing issues must be raised in a postsentenc-

---

[1]Due to the page limitations imposed under revised Supreme Court Rule 23 (166 Ill. 2d R. 23), we are compelled to delete from the published portion of this opinion our findings that the trial court did not abuse its discretion when it held that there was no discovery violation and our finding that the failure of Clifton's counsel to move for dismissal for lack of a speedy trial did not deny him effective assistance of counsel. We must also delete from our discussion our rejection of Clifton's argument that the evidence was insufficient to establish Clifton's guilt either as a principal or on an accountability theory. Our discussion of these issues in included in the full, unabridged text of this opinion which is on file with the clerk of this court under docket Nos. 1—98—2126, 1—98—2384 (consolidated).

[2]Defendant Galloway did not participate in the supplemental appeal.

ing motion to preserve them for appellate review). However, we find that this issue is controlled by our supreme court's subsequent decision in *People v. Wilson*, 181 Ill. 2d 409, 413, 692 N.E.2d 1107, 1108 (1998) ("We find that under [*People v. Williams*, 179 Ill. 2d 331, 688 N.E.2d 1153 (1997)], a challenge to a trial court's statutory authority to impose a particular sentence is not waived when a defendant fails to withdraw his guilty plea and vacate the judgement"). The clear implication of *Wilson* is that whenever a defendant challenges the trial court's statutory authority to impose a particular sentence, those contentions are not subject to waiver. Here Clifton argues that his sentence was imposed pursuant to an unconstitutional statute.[3] We will thus address Clifton's substantive arguments based on *Apprendi*.

■ In *Apprendi* the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. The Court further endorsed the statement that it "is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2363. The *Apprendi* Court held unconstitutional a New Jersey statute which increased the range of sentence for second degree offenses where the court found that the crime was motivated by bias based on, *inter alia*, race. *Apprendi*, 530 U.S. at 491-92, 147 L. Ed. 2d at 456, 120 S. Ct. at 2363-64. *Apprendi*, however, did not address the issue of consecutive sentences.

We are thus presented with the novel question of whether the *Apprendi* regime applies to section 5—8—4(a). If the statute in question increased the penalty range or the maximum penalty for a particular crime, it would seem that the statute would unquestionably be within the scope of *Apprendi*. However, section 5—8—4(a) operates differently from the sort of extended-sentencing statute found unconstitutional in *Apprendi*. Rather than increasing the range of sentence for a particular crime, it controls, *inter alia*, when a defendant who is being sentenced for multiple convictions resulting from the same course of

---

[3]Moreover, while new constitutional rules of criminal procedure are not to be applied retroactively to postconviction proceedings, that restriction does not apply to matters still pending on direct appeal. *Teague v. Lane*, 489 U.S. 288, 103 L. Ed. 2d 334, 109 S. Ct. 1060 (1989); *People v. Flowers*, 138 Ill. 2d 218, 561 N.E.2d 674 (1990).

conduct will serve those sentences concurrently and when he will serve those sentences consecutively.

While there are formal distinctions between the types of statutes involved in *Apprendi* and in this case, we find it difficult to distinguish between a statute enhancing an individual sentence from a statute requiring an extended period of incarceration, albeit through the stacking of two nonenhanced sentences. It would be anomalous to hold that where a statute mandates the enhancement of an individual sentence the enhancement factors must be tried by the jury while a statute requiring an extended period of service by requiring consecutive sentences would remain outside the purview of the *Apprendi* rationale. While section 5—8—4(a) does not affect the range of sentence for any particular crime, it does, obviously, have a great effect on the amount of time a given defendant will spend in the penitentiary. Normally, sentences are to be served concurrently when a defendant is sentenced for multiple crimes that were part of the same course of conduct. Section 5—8—4(a) states:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury ***." 730 ILCS 5/5—8—4(a) (West Supp. 1997).

However, if the court finds that the defendant inflicted severe bodily injury, the sentences will run consecutively. Thus, while section 5—8—4(a) does not enhance the sentence for any particular crime, it does extend the range of sentence to which a defendant may be exposed for a given course of conduct.

If the court does not make a finding that the defendant inflicted severe bodily injury, the maximum penalty to which the defendant is exposed for a given course of conduct is effectively the maximum penalty for the offense with the longest possible sentence because any other sentences will run concurrently. Thus the defendant would not be incarcerated for longer than that period. However, if the court finds that the defendant inflicted severe bodily injury, the sentences run consecutively. Then the defendant could potentially be incarcerated for the aggregate of the maximum penalties for the two most serious felonies involved. 730 ILCS 5—8—4(c)(2) (West Supp. 1997). Thus, the practical effect of section 5—8—4(a) is that a factual finding of serious bodily injury by a judge will increase, even to the point of doubling, the actual and potential sentence that the defendant may receive for a given course of conduct.

■ This is precisely the type of result that the Supreme Court

meant its holding in *Apprendi* to encompass. In deciding to hold the New Jersey statute unconstitutional, the Court focused on the effect of the statute, not its form. *Apprendi*, 530 U.S. at 494, 147 L. Ed. 2d at 457, 120 S. Ct. at 2365 ("the relevant inquiry is not one of form, but of effect—does the required finding expose the defendant to greater punishment than is authorized by the jury's guilty verdict?"). The Court also explained the reasoning behind its holding, stating that if:

"a defendant faces punishment beyond that provided by statute when an offense is committed under certain circumstances but not others, it is obvious that both the loss of liberty and the stigma attaching to the offense are heightened; it necessarily follows that the defendant should not—at the moment the State is put to proof of those circumstances—be deprived of protections that have, until that point, unquestionably attached." *Apprendi*, 530 U.S. at 484, 147 L. Ed. 2d at 451, 120 S. Ct. at 2359.

Here, as we have shown, the penalties for Clifton's collective offenses were heightened when the judge made a finding of infliction of severe bodily injury. The stigma and loss of liberty attached to a set of offenses wherein the defendant inflicted serious bodily harm are unquestionably greater than the stigma and loss of liberty attached to a set of offenses where no such bodily harm occurred. Consequently, we find that it would be unduly narrow and arbitrary to hold that *Apprendi* should not attach to the imposition of consecutive sentences requiring as a precondition such a factual determination in addition to those facts necessary to obtain a conviction for the crime charged.[4]

Thus we hold that the requirement of section 5—8—4(a) of the Unified Code of Corrections that a defendant be sentenced to consecutive sentences for crimes arising out of the same course of conduct when the court makes a finding that he inflicted severe bodily injury is unconstitutional under *Apprendi*. If consecutive sentences are to be imposed pursuant to a factual finding that severe bodily injury occurred, then severe bodily injury will have to be submitted to a jury and proved beyond a reasonable doubt.

## SUPPLEMENTAL OPINION UPON GRANTING OF DEFENDANT GALLOWAY'S PETITION FOR REHEARING

After we issued our initial opinion in this case on September 29, 2000, defendant Galloway filed a petition for rehearing in which he

---

[4]Because we hold that Clifton's sentences must run concurrently due to the unconstitutionality of the consecutive sentencing statute we need not address the issue of whether *Apprendi* requires that the facts upon which sentence enhancement depends must be pled in the indictment or information.

raised an *Apprendi* challenge to his sentences. We allowed the State to file a response and Galloway to file a reply. We then granted the petition for rehearing and we now address the substantive arguments contained within it.

■ The State first argues that Galloway may not raise an *Apprendi* challenge to his sentence for the first time in a petition for rehearing. We disagree.

While Supreme Court Rule 341(e)(7) states that "[p]oints not argued are waived and shall not be raised *** on petition for rehearing" (177 Ill. 2d R. 341(e)(7)), waiver is not jurisdictional and the waiver rule may be relaxed to maintain a uniform body of precedent or where the interests of justice so require. *American Federation of State, County & Municipal Employees, Council 31 v. County of Cook*, 145 Ill. 2d 475, 480, 584 N.E.2d 116, 118-19 (1991). Furthermore, "Rules 615(a) and (b)(4) [citation] empower the appellate court to 'review any criminal sentence even though the issue [was] not raised on appeal.' [Citations.]" *People v. Weiss*, 263 Ill. App. 3d 725, 734, 635 N.E.2d 635, 641 (1994) (addressing sentencing issues raised for the first time in a timely petition for rehearing); *People v. White*, 5 Ill. App. 3d 205, 207, 282 N.E.2d 467, 468 (1972); 134 Ill. 2d R. 615; *cf. People v. Kaczmarek*, 318 Ill. App. 3d 340, 348, 741 N.E.2d 1131, 1139 (2000). Consequently, we will address the *Apprendi* arguments raised by Galloway for the first time in his petition for rehearing. This is particularly cogent with respect to this case, since it would be wholly incongruous to grant relief based on *Apprendi* to Clifton, but not to his codefendant, Galloway.

■ Galloway first argues that his consecutive sentences violate *Apprendi* for the same reason that Clifton's consecutive sentences violate *Apprendi*. Galloway thus asks us to vacate the order requiring his sentences to run consecutively and order that they run concurrently, as we did in Clifton's case. We agree. Galloway was sentenced to consecutive sentences under section 5—8—4(a) of the Unified Code of Corrections after the court made a factual finding that he inflicted severe bodily injury during the commission of the offenses. As we discussed above, under *Apprendi*, such a factual finding must be submitted to the jury.[5]

Galloway next argues that his extended sentences of 80 years for

---

[5]We note that the Court in *Apprendi* apparently had an opportunity to address the issue of the applicability of the *Apprendi* rule to consecutive sentences, but declined to do so. *Apprendi*, 530 U.S. at 474, 147 L. Ed. 2d at 445, 120 S. Ct. at 2354. This occurred when the New Jersey prosecutor sought to contend that an extended sentence should be permissible since the trial court

first degree murder and 40 years for attempted first degree murder are also unconstitutional under *Apprendi* and must be reduced to their statutory maximums. The State argues in opposition that the sentence imposed for first degree murder is not unconstitutional under *Apprendi* because it is less than the maximum sentence of death. The State also contends that the sentence of 40 years for attempted first degree murder is not unconstitutional because the enhancement was imposed upon a factual finding that the defendant had prior convictions, which is permissible under *Apprendi*.

Galloway first argues that his sentences of 80 years for first degree murder and 40 years for attempted first degree murder exceed the maximum sentences within the statutorily set range for those crimes. In support, Galloway argues that the sentencing range for first degree murder is 20 to 60 years (730 ILCS 5/5—8—1(a)(1)(a) (West Supp. 1995)) and that the range for attempted first degree murder (a Class X felony (730 ILCS 5/8—4(c)(1) (West Supp. 1995))) is 6 to 30 years (730

---

had the alternative to sentence the defendant consecutively. Since the original decision in this case was issued, another division of this court in *People v. Lucas*, 321 Ill. App. 3d 49, 56 (2001), sought to find support from the Supreme Court's silence in the face of that contention to exclude consecutive sentences from the ambit of *Apprendi*. As we discussed above, we find no logic or utility in an attempt to restrict the holding of *Apprendi* to extended sentences but not to consecutive sentences. Such sentences engender the same "loss of liberty" resulting from "punishment beyond that provided by statute when an offense is committed under certain circumstances but not others" which *Apprendi* sought to address. *Apprendi*, 530 U.S. at 484, 147 L. Ed. 2d at 451, 120 S. Ct. at 2359. To distinguish between the findings necessary to impose consecutive sentences and the findings necessary to impose an extended sentence would reduce *Apprendi* to a mere technical exercise without a meaningful basis for any such distinction. Thus, to draw any support from *Apprendi*'s failure to address the New Jersey prosecutor's hypothetical argument raising such a distinction is at best tenuous and precarious.

We also note that the New Jersey consecutive sentencing scheme is quite different from the one employed in Illinois. The New Jersey consecutive sentencing scheme does not statutorily provide for aggravating factors which must be satisfied to impose consecutive sentences. Rather, those factors are a matter of New Jersey common law and they do not include a finding of severe bodily injury as is required by Illinois law. *State v. Yarbough*, 100 N.J. 627, 644, 498 A.2d 1239, 1247-48 (1985); N.J. Stat. Ann § 2C:44—5 (West 2000); 730 ILCS 5/5—8—4(a) (West Supp. 1997). Accordingly, any inference to be drawn, no matter how tenuous, from the New Jersey consecutive sentencing scheme would, in any event, be even less applicable to the scheme employed in Illinois where the criteria for consecutive sentences are formulated by the statute empowering that result.

ILCS 5/5—8—1(a)(3) (West Supp. 1995)). The State contends that the 80-year sentence is within the sentencing range for first degree murder, which runs from 20 years in prison up to and including the death penalty. We agree with Galloway.

As we have previously discussed under *Apprendi,* it " 'is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.' " *Apprendi,* 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2363, quoting *Jones v. United States,* 526 U.S. 227, 252, 143 L. Ed. 2d 311, 332, 119 S. Ct. 1215, 1228 (1999) (Stevens, J., concurring). However, the *Apprendi* court noted that nothing in its analysis "suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgement within the range prescribed by statute." (Emphasis omitted.) *Apprendi,* 530 U.S. at 481, 147 L. Ed. 2d at 449, 120 S. Ct. at 2358. Thus to determine if Galloway's sentences violate *Apprendi,* we must first determine if his sentences fall within the prescribed range of penalties for his crimes.

The primary sentencing statute for first degree murder, section 5—8—1(a)(1)(a) of the Unified Code of Corrections (Code), provides that the sentence for first degree murder shall be a term "not less than 20 years and not more than 60 years." 730 ILCS 5/5—8—1(a)(1)(a) (West Supp. 1995). If certain aggravating factors are found, a sentence of life in prison (730 ILCS 5/5—8—1(a)(1)(b) (West Supp. 1995)) or the death penalty (730 ILCS 5/5—8—1(a)(1)(c) (West Supp. 1995)) may be imposed. Galloway, however, was sentenced under section 5—8—2(a)(1) of the Unified Code of Corrections (730 ILCS 5/5—8—2(a)(1) (West 1994)), which provides that if aggravating factors enumerated in section 5—5—3.2(b) of the Code (730 ILCS 5/5—5—3.2(b) (West Supp. 1995)) are found, an extended sentence of 60 to 100 years may be imposed for first degree murder.

It is clear from this statutory scheme that the statutory range of sentence for first degree murder is 20 to 60 years. The death penalty cannot, as the State suggests, be the maximum penalty within the range because the statute does not permit penalties between 60 years in prison and life in prison. While a sentence of 80 years may be greater than 20 years in prison and less severe than the death penalty, section 5—8—1 makes no provision for such a sentence and thus such a sentence cannot be said to be within the statutory sentencing range for first degree murder in a noncapital case.

This court rejected the argument that the maximum sentence for murder is life in prison or the death penalty in *People v. Kaczmarek,* 318 Ill. App. 3d 340, 741 N.E.2d 1131 (2000), and in *People v. Lee,* 318

Ill. App. 3d 417 (2000). The *Kaczmarek* court held that 60 years is the prescribed maximum penalty for first degree murder. The court reasoned that "for any punishment exceeding 60 years, including either a term of life or the death penalty, to be imposed, additional aggravating factors must be found to exist." *Kaczmarek*, 318 Ill. App. 3d at 350, 741 N.E.2d at 1141, citing *People v. Beachem*, 317 Ill. App. 3d 693, 707, 740 N.E.2d 389, 398-99 (2000). The court thus found that 60 years is the maximum sentence for murder. *Kaczmarek*, 318 Ill. App. 3d at 350, 741 N.E.2d at 1141 (sentence of life in prison exceeded maximum sentence for murder).

Nor do we find that the range of sentences for first degree murder is 20 to 100 years. The legislature clearly provided two sentencing ranges for first degree murder. The statutes provide for a range of 20 to 60 years under normal circumstances and a second and distinct range of 60 to 100 years for extended sentences. The 60- to 100-year range is provided for in a distinct section of the Unified Code of Corrections, labeled "extended sentences," and nowhere does the Code on its face provide for a range of 20 to 100 years for first degree murder. *Beachem*, 317 Ill. App. 3d at 707, 740 N.E.2d at 398-99 (90-year sentence exceeded maximum sentence of 60 years for murder). Thus Galloway's 80-year sentence for first degree murder represents an extension of the prescribed statutory range and clearly falls within the parameters of *Apprendi. Kaczmarek*, 318 Ill. App. 3d at 350, 741 N.E.2d at 1141; *Lee*, 318 Ill. App. 3d at 422.

Each of the cases cited by the State is distinguishable, in that in each of them the enhancement which the state contends takes place without the need for a finding by the trier of fact, occurs within the unextended range. In *United States v. Smith*, 223 F.3d 554 (7th Cir. 2000), the court held that where the sentencing range for a given crime was 30 years to life, a statute that eliminated all sentences below a life sentence upon the court's finding of certain facts, was permissible under *Apprendi*. The critical distinction between *Smith* and the case at bar is that in *Smith* any sentence between 30 years and life was possible within the unextended range. Under the sentencing statutes governing the case at bar, a sentence between 20 and 30 years is encompassed within the unextended range. 730 ILCS 5/5—8—1(a)(1)(a) (West Supp. 1995). Any sentence beyond 60 years is controlled by a statute specifically providing for an extended sentence upon the fulfillment of certain criteria. 730 ILCS 5/5—8—2(a)(1) (West 1994). The same is true with respect to *Hernandez v. United States*, 226 F.3d 839 (7th Cir. 2000), where the court found that a sentence of 200 months imposed after a factual finding by the trial court did not violate *Apprendi* where the statutory range was "any term of years or

for life." Likewise in *State v. Conley*, ___ Kan. ___, 11 P.3d 1147 (2000), the court found that where the defendant was sentenced to life in prison, a sentencing enhancement such that he would not be eligible for parole until after 40 years, rather than the usual 25, did not violate *Apprendi*.

Thus, since the range of sentence for first degree murder in a non-capital case is 20 to 60 years, any sentence imposed under section 5—8—2(a), which provides for an extended sentence of 60 to 100 years, may only be imposed if the factual determinations triggering enhancement (other than prior convictions) are found by a jury beyond a reasonable doubt. *People v. Armstrong*, 318 Ill. App. 3d 607, 616-17 (2000) (aggravating factors in section 5—5—3.2(b) must be proved beyond a reasonable doubt). Thus we hold that to the extent that section 5—8—2(a) permits an extended term to be imposed for first degree murder when a judge, rather than a jury, finds the presence of factors enumerated in section 5—5—3.2(b) (other than prior convictions), it is unconstitutional under *Apprendi*. *Cf. People v. Thurow*, 318 Ill. App. 3d 128, 135 (2001) (holding section 5—5—3.2(b)(4)(i) of the Unified Code of Corrections (730 ILCS 5/5—5—3.2(b)(4)(i) (West 1998)) unconstitutional "to the extent that it allows an increase in punishment for a felony based on the age of the victim where that specific finding is not charged to the jury").

The forgoing analysis applies equally to Galloway's sentence of 40 years for attempted first degree murder. Attempted first degree murder is a Class X felony which carries a sentence of 6 to 30 years. 730 ILCS 5/5—8—1(a)(3) (West Supp. 1995). Galloway, however, was sentenced under section 5—8—2(a)(2), which provides for an extended sentence of 30 to 60 years if the court finds aggravating factors enumerated in section 5—5—3.2. We have already held that section 5—8—2(a) is unconstitutional to the extent that it permits an extended sentence to be imposed when the court finds the existence of an aggravating factor other than prior convictions.

The State contends, however, that the enhancement of Galloway's sentence for attempted first degree murder was made on the basis of Galloway's prior convictions, a basis for enhancement which need not be submitted to the jury under *Apprendi*.[6] Since it is not clear from the record what factors the trial judge used in finding that Galloway was eligible for an extended sentence, such a determination should be more appropriately made on remand. *People v. Myers*, 292 Ill. App. 3d 757, 760-61, 686 N.E.2d 363, 366 (1997) (cause remanded for

---

[6]The State does not make this argument with regard to Galloway's 80-year sentence for first degree murder.

resentencing where it was unclear how improper consideration of aggravating factors influenced the trial court's sentence). If the extended sentence was imposed based on Galloway's prior convictions, then it may stand, as the fact of prior convictions need not be found by a jury and proved beyond a reasonable doubt under *Apprendi*. *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 454-55, 120 S. Ct. at 2362-63. However, if the judge imposed the extended sentences after making other factual findings which are not exempt from the *Apprendi* regime, then the extended sentences cannot stand.[7]

As to both defendants, we affirm the judgments of conviction and vacate the orders requiring their sentences to run consecutively and order their sentences to run concurrently. Additionally, as to defendant Galloway, we vacate his extended sentences of 80 years for first degree murder and 40 years for attempted first degree murder and remand this cause to the circuit court of Cook County for a new sentencing hearing, not inconsistent with this opinion.

Affirmed in part and reversed in part; cause remanded.

McNULTY and McBRIDE, JJ., concur.

---

[7]As we find that the extended-term sentences violate *Apprendi* (unless they were imposed on the basis of prior convictions), we need not address Galloway's argument that the extended sentences were improperly imposed because the grounds on which the judge imposed the sentences were other than those permitted by section 5—5—3.2(b).